JAMES McNAIR THOMPSON
SBN 67807
LAW OFFICES OF JAMES McNAIR THOMPSON
PO BOX 636
LOS GATOS CA 95031
(408) 358-6047
Attorney for Misako Yamaguchi

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 15 – CR – 00395 – BLF |
| | ) |
| Plaintiff, | ) EXHIBITS IN SUPPORT OF MOTION |
| | ) TO WITHDRAW PLEA |
| vs. | ) |
| | ) |
| MISAKO YAMAGUCHI, | ) |
| | ) |
| Defendant | ) |
| | ) |

Defendant Yamaguchi submits the following Exhibits:

1. Elliot to Schenk email

2. Doc. 14 Elliot Sentencing Memorandum

3. Doc. 24 Transcript of Sentencing

EXHIBIT 1

ELLIOT – SCHENK EMAILS

**James McNair Thompson**

| | |
|---|---|
| **From:** | "Schenk, Jeffrey (USACAN)" <Jeffrey.B.Schenk@usdoj.gov> |
| **Date:** | Tuesday, October 10, 2017 3:41 PM |
| **To:** | <jmtesq@verizon.net> |
| **Subject:** | FW: Ms. Yamaguchi |

Jim,

I received this email from Mr. Elliot.  I will work with him to turn this into a declaration.  If you want to take the lead on drafting the order piercing the attorney-client privilege, I'd be happy to review it.

Jeff

**From:** Kirk Elliott [mailto:kelliott@robertselliott.com]
**Sent:** Tuesday, October 10, 2017 2:25 PM
**To:** Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>
**Subject:** Re: Ms. Yamaguchi

Mr. Schenk,
As I discussed with you and  Mr. Thompson, counsel for my former client, if called I would testify  along the following lines with regard to the immigration issue.
    I was Ms. Yamaguchi' attorney in the underlying matter and represented her from the initial contact by the FBI, through her sentencing on the matter.
    During my investigation and while consulting with my client, I became aware of  her immigration status. Her status as a " long Time green card holder" was discussed as was the fact that she was not a US Citizen. I was surprised and asked her why  she never attempted to finalize the naturalization  process, when I understood that  the rest of her family were all US Citizens .  We discussed the consequences of deportation and or denial of naturalization both prior to plea negotiations  and after.
    I discussed the immigration consequences  of entering a Felony plea in this serious  case  with her on multiple occasions. These discussions occurred  both prior to and during the  multiple amendments to the plea agreement. The Immigration consequences  ( including deportation were also, spelled out within said  Plea agreement. She read this document and signed it.
    I advised  M s. Yamaguchi on several occasions that if she took the deal and entered this plea, she must assume that she would be deported.
She indicated that if that occurred, as a Japanese citizen she would just live in Japan and be closer with her ailing parents. She knew this was a very likely consequence, and my advice and recommendation was still to take the deal... based on the totality of the circumstances.
We discussed her  immigration status and consequences again with the probation officer interview and again when she requested that I find out if she could go travel back to  Japan  (prior to the sentencing) to visit her mother.
Finally, we discussed the immigration issues and consequences again before and during  the preparation of my sentencing brief ( which is why I wanted EMP not jail !) and with the Judge on the record during sentencing.
Please let me know if I can be of any further assistance.

Sent from my iPhone.  Spelling and grammar have not been checked.

*Sincerely,*

10/11/2017

*Kirk Elliott, Esq.*
*Partner*
ROBERTS❖ELLIOTT
Law Corporation
Heritage Bank Building
150 Almaden Blvd.
Suite 950
San Jose, CA 95113
Phone: (408) 275-9800
Fax: (408) 287-3782
 E-MAIL: kelliott@robertselliott.com

*CONFIDENTIALITY NOTICE: This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 USC 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This communication may contain confidential and privileged material for the sole use of the intended recipient and receipt by anyone other than the intended recipient does not constitute a loss of the confidential or privileged nature of the communication. Any review or distribution by others is strictly prohibited. If you are not the intended recipient please contact the sender by return electronic mail and delete all copies of this communication. For more information about Roberts & Elliott, Law Corp please contact us at (408) 275-9800.*

On Oct 10, 2017, at 9:39 AM, Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov> wrote:

> Hi Kirk,
>
> Today, Judge Freeman found that Yamaguchi waived her attorney-client privilege as to the issue of your advice to her concerning the immigration consequences of her guilty plea.  Could we please talk when you have a moment?  I would like to discuss a declaration and a search through your emails for anything relevant.
>
> Thanks
> Jeff
>
>
> Jeff Schenk
> Assistant United States Attorney
> U.S. Attorney's Office
> Northern District of California
> 150 Almaden Blvd. Suite 900
> San Jose, CA 95113
> 408-535-2695

EXHIBIT 2

ELLIOT SENTENCING MEMORANDUM

1  **ROBERTS ❖ ELLIOTT**
   LAW CORPORATION
2  150 Almaden Boulevard
   Suite 950
3  San Jose, CA  95113
   Telephone:  (408) 275-9800
4
   KIRK W. ELLIOTT, ABN 141641
5  Attorneys for Defendant

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE VENUE

11

12  UNITED STATES OF AMERICA,        )    Case No. 5:15cr00395-001 BLF
                                     )
13          Plaintiff,               )    DEFENDANT YAMAGUCHI'S
                                     )    SENTENCING MEMORANDUM
14       vs.                         )
                                     )
15  MISAKO YAMAGUCHI,                )    DATE:      February 2, 2016
                                     )    TIME:      9:00 a.m.
16          Defendant.               )    DEPT:      Hon. Beth Labson Freeman
                                     )
17                                   )
   _____   )
18

19         Defendant MISAKO YAMAGUCHI remorsefully appears before this honorable Court for

20  entry of judgment and sentencing. Due to substantial mitigating circumstances regarding Defendant

21  Misako Yamaguchi's background and her desire and agreement to pay full restitution for the offense,

22  the defense is in agreement with the Probation Officer's recommendation and  respectfully requests

23  that the Court vary downward from the applicable advisory Guidelines range.

24         Defendant Misako Yamaguchi respectfully requests that this Court move a step further than

25  the Probation Officer's recommendation and sentence her to Probation with conditions that include

26  10 to 12  months of home detention.

27  //

28  //

                                    - 1 -

1

**I**

2

**PLEA AGREEMENT**

3      Ms. Yamaguchi and the government entered into a written plea agreement pursuant to *Rules*

4 *11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure*. As part of the plea

5 agreement, Defendant Misako Yamaguchi pleaded guilty to mail fraud in violation of *18 U.S.C.*

6 *Section 1341*. The plea agreement calculated Defendant Misako Yamaguchi's adjusted offense level

7 under the Sentencing Guidelines to be 16.

8      The parties agreed to the guideline range corresponding to an adjusted offense level of 16.

9      The United States agreed to recommend a sentence within the guideline range corresponding

10 to an adjusted level of 16.

11      Further, Defendant Misako Yamaguchi agreed to said Sentencing Guidelines but also

12 reserved the right to seek a below guideline sentence based on the factors as set forth in *18 U.S.C.*

13 *Section 3553(a)*. The government reserved the right to oppose any such motion.

14      The Probation Sentencing Report lists many of the *18 U.S.C. Section 3553(a)* factors and

15 recommends a variance below the proposed Sentencing Guidelines. This brief highlights those and

16 other factors consistent with our request for a variance from the proposed guidelines. The applicable

17 guideline range for an Offense Level of 16 and a Criminal History 1, is in Zone D of the Sentencing

18 Table. In Zone D, the minimum term must be satisfied by a sentence of imprisonment. USSG

19 §5C1.1(f).

20

**II**

21

**PRESENTENCE INVESTIGATION REPORT**

22      The Presentence Investigation Report agrees with the Plea Agreement regarding the

23 appropriate offense level. According to the report, the total offense level is 16.

24      Defendant Misako Yamaguchi does not dispute the guideline calculations in the Presentence

25 Investigation Report. The Sentencing Guidelines, however, are advisory, not mandatory, and the

26 Court is not precluded from varying downward to sentence defendant, Misako Yamaguchi in

27 accordance with the Probation Officer's recommendation, and/or a Grant of Probation as the defense

28 is requesting. United States v. Booker (2005) 125 S. Ct. 738.

**III**

**MS. YAMAGUCHI RESPECTFULLY REQUESTS THAT SHE BE SENTENCED TO PROBATION WITH CONDITIONS THAT INCLUDE TEN (10) TO TWELVE (12) MONTHS OF HOME DETENTION**

In *United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008)*, the Ninth Circuit explained that,

> The overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a) and (a)(2).

All sentencing proceedings are begun by the district court calculating the applicable guideline range. The District Court then should consider the sentencing factors set forth in *Section 3553(a)* to determine if they support the sentence suggested by either of the parties. Carty, supra, 520 F.3d at 991. These factors include:

> the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims. 18 U.S.C. § 3553(a)(1)-(7). Id.

Here, although the Presentence Investigation Report recommends a sentence below the applicable advisory guideline range, it notes on page 2 of the Sentencing Recommendation that there are mitigating factors that "[t]he Court may want to consider . . . in determining if a downward variance is appropriate in this case." These factors include that Defendant Misako Yamaguchi has no prior convictions or law enforcement contacts and her age (61) suggests the likelihood of recidivism is greatly reduced. Additionally, Ms. Yamaguchi has the ability to pay half (i.e., $155,000.00) of the agreed upon loss to the Yomato Scientific America (YSA) (i.e., $309,523.98) within thirty (30) days of sentencing. In addition, Defendant Misako Yamaguchi will make every effort to pay the entire balance of restitution ordered during her grant of Probation or Supervised Release.

//

1    Defendant Misako Yamaguchi has negotiated in good faith with the victim's counsel as well

2    as the United States in resolving the restitution requested in this matter. Further, Ms. Yamaguchi has

3    abstained from the use of  alcohol and/or drugs her entire life, has a very stable marriage (of 26

4    years), and a supportive family life.  Defendant Misako Yamaguchi believes that these factors, along

5    with the additional mitigating factors described below, warrant a downward variance from the

6    applicable guideline range and a probation sentence.

7    **A.    Early Admission of Wrongdoing and Acceptance of Responsibility**

8    Defendant Misako Yamaguchi admitted her wrongdoing at the earliest stage of the

9    case, and waived her right to Indictment and consented to prosecution by information. The Probation

10   Officer, as well as Counsel, believed that Defendant Misako Yamaguchi's expression of remorse

11   during her probation interview was sincere and cooperative.  She explained that she "accepts

12   responsibility for this offense. I apologize for my conduct and I feel very remorseful and I will make

13   better choices in the future."

14   As the Probation Recommendation pointed out, Defendant Misako Yamaguchi has

15   clearly demonstrated acceptance of responsibility and assisted authorities in the investigation and

16   prosecution of her own misconduct by timely notifying the authorities of her intention to enter a plea

17   of guilty.

18   **B.    Nature of Criminal Conduct**

19   Defendant, Misako Yamaguchi, acknowledged in her Plea Agreement her role in

20   diverting customers to purchase Lab equipment through Green Bike Lab instead of directly from

21   YSA Corp. This caused a diversion of profits from YSA Corp. to Green Bike and a pecuniary loss

22   to the victim's corporation of $309,523.98.

23   **C.    Lack of Criminal History**

24   Ms. Yamaguchi has no prior criminal record and no prior contacts with law

25   enforcement.

26   **D.    Lengthy Employment History**

27   Defendant, Misako Yamaguchi, is educated (BS Industrial Engineering) and speaks

28   four languages. She has worked full time for various companies since 1996, this while raising two

- 4 -

1    children and caring for her family.

2        **E.    Ms. Yamaguchi's  Medical Condition**

3        Defendant, Misako Yamaguchi, suffers from kidney disease, high blood pressure and

4    hypertension. She is currently under the care of a physician and is taking prescription medication for

5    these conditions. These medications include Metoprolol, Listinopril, Amlodipine, Besylate and

6    Hydrochlorothiazide. As a result, incarceration in Federal Prison could jeopardize Ms. Yamaguchi's

7    health and/or aggravate her multiple conditions.

8        This is another reason why Defendant is seeking Home Detention and Probation.  Defendant,

9    Misako Yamaguchi's, husband also suffers from heart disease and recently underwent quadruple

10   bypass surgery.  He relies on Ms. Yamaguchi's care around the home and for medical visits.

11                                    **IV**

12                              **RESTITUTION**

13       In the present case, probation's  recommendation was to order restitution for the loss in the

14   total amount of $309,523.98. In addition, Defendant, Misako Yamaguchi, has agreed to pay the

15   investigative costs and attorneys fees incurred by the victim, YSA Corp. in the amount of

16   $340,376.03. The total amount of restitution recently requested by the victim YSA Corp. was

17   $722,833.52. Counsel for the victim, YSA Corp., along with counsel for Defendant, Misako

18   Yamaguchi, have stipulated to the additional amount of $340,476.02. This amount represents

19   reimbursement for the loss suffered by the victim as well as all additional investigative costs and

20   attorney's fees.

21       Thus, the total amount of restitution to be ordered, as stipulated by and between the parties

22   is $650,000.00.

23                                    **V**

24                              **CONCLUSION**

25       The mitigating circumstances outlined above and in the Presentence Investigation Report

26   justify a downward variance from the applicable advisory guideline range.  Moreover, such a

27   sentence will satisfy the requirement that the sentence imposed be "sufficient, but not greater, than

28   necessary" to comply with the purposes set forth in *18 U.S.C. Section 3553(a)(2)*.

1    A probation sentence with conditions that include Ten (10) to Twelve (12) months of home

2    detention is commensurate with the seriousness of Defendant Misako Yamaguchi's offense and is

3    substantial enough to deter her from committing similar crimes in the future.   Moreover, such a

4    sentence will allow Defendant Misako Yamaguchi to maintain  employment, and pay the victim

5    restitution far more quickly.

6                                                        Respectfully submitted,

7                                                        ROBERTS ❖ ELLIOTT
                                                         LAW CORPORATION
8                                                        Attorneys for Defendant

9
     DATED: January 26, 2016                             By:   /s/ Kirk Elliott
10                                                              KIRK W. ELLIOTT
                                                               Attorney at Law
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **ROBERTS ❖ ELLIOTT**
LAW CORPORATION
2   150 Almaden Boulevard
Suite 950
3   San Jose, CA  95113
Telephone:  (408) 275-9800
4

5   KIRK W. ELLIOTT, ABN 141641
Attorneys for Defendant

6

7

8                UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE VENUE

11

12   UNITED STATES OF AMERICA,    )   Case No. 5:15cr00395-001 BLF
                         )
13           Plaintiff,        )   CERTIFICATE OF SERVICE
                         )
14       vs.                  )
                         )
15   MISAKO YAMAGUCHI,        )
                         )
16         Defendant.      )
                         )
17                          )
   _____)
18

19        I hereby certify that on January 26, 2016, I electronically filed the **DEFENDANT**

20   **YAMAGUCHI'S SENTENCING MEMORANDUM** with the Clerk of the Court for the United

21   States District Court for the Northern District of California using the Court's CM/ECF system.

22        I certify that the following person(s) are participants in the case and are registered CM/ECF

23   users and were served via the CM/ECF system:

24       David Countryman
        david.countryman@usdoj.gov,
25       carolyn.jusay@usdoj.gov,
        hector.lopez2@usdoj.gov
26

       Jeffrey Benjamin Schenk
27       jeffrey.b.schenk@usdoj.gov
        laurie.worthen@usdoj.gov

28

I certify that the following person(s) were served by email:

Amber S. Rosen
amber.rosen@usdoj.gov

Leon T. Dang
leon_dang@canp.uscourts.gov

Executed on January 26, 2016 at San Jose, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____*/s/ Kirk Elliott*_____

EXHIBIT 3

SENTENCING TRANSCRIPT

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                         SAN JOSE DIVISION

 4

 5
       UNITED STATES OF AMERICA,        )   CR-15-00395-BLF
 6                                       )
                        PLAINTIFF,       )   SAN JOSE, CALIFORNIA
 7                                       )
                   VS.                   )   FEBRUARY 2, 2016
 8                                       )
       YAMAGUCHI,                        )   PAGES 1-33
 9                                       )
                        DEFENDANT        )
10                                       )

11

12                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE BETH LABSON FREEMAN
13                  UNITED STATES DISTRICT JUDGE

14

15        A P P E A R A N C E S:

16        FOR THE PLAINTIFF:  UNITED STATES ATTORNEY'S OFFICE
          UNITED STATES        BY:  AMBER ROSEN
17                             150 ALMADEN BLVD., STE 900
                               SAN JOSE, CA  95113
18

19        FOR THE DEFENDANT:  ROBERTS ELLIOTT, LLP
                               BY:  KIRK WINCOTE ELLIOTT
20                             150 ALMADEN BLVD, SUITE 950
                               SAN JOSE, CA 95113
21

22        PROBATION:          LEON DANG

23        OFFICIAL COURT REPORTER:  SUMMER FISHER, CSR, CRR
                                    CERTIFICATE NUMBER 13185
24

25           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1          SAN JOSE, CALIFORNIA              FEBRUARY 2, 2016

 2                    P R O C E E D I N G S

 3          (WHEREUPON, COURT CONVENED AND THE FOLLOWING PROCEEDINGS

 4     WERE HELD:)

 5               THE CLERK:  CALLING CASE 15-0395.  UNITED STATES

 6     MISAKO YAMAGUCHI.

 7          COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

 8               MR. ELLIOTT:  GOOD MORNING, YOUR HONOR.

 9          KIRK ELLIOTT APPEARING ON BEHALF OF MS. YAMAGUCHI, SHE'S

10     PRESENT IN COURT OUT OF CUSTODY.

11               MS. ROSEN:  AMBER ROSEN FOR THE UNITED STATES,

12     YOUR HONOR.

13               PROBATION OFFICER:  GOOD MORNING, YOUR HONOR.

14               THE COURT:  AND OUR PROBATION OFFICER IS HERE.  GOOD

15     MORNING.

16          BEFORE WE BEGIN, I'M NOT SURE WHY THIS PRESENTENCE REPORT

17     GOT MODIFIED SO MANY TIMES, BUT I HAVE TO IDENTIFY ONE ERROR IN

18     IT THAT I WOULD ASK BE AMENDED.  AND THAT IS, IT'S JUST A TYPO,

19     PAGE 3, AND ITEM NUMBER 3, REFERS TO A THREE LEVEL INCREASE FOR

20     ACCEPTANCE OF RESPONSIBILITY, AND THAT SHOULD SAY THREE LEVEL

21     DECREASE.

22          AND I WOULD LIKE YOU TO SUBMIT A NEW REPORT WITH THAT

23     CLARIFICATION SO THAT OUR RECORD IN THE FUTURE IS ACCURATE?  DO

24     YOU SEE THAT?

25               PROBATION OFFICER:  YES, YOUR HONOR.
```

```
 1              THE COURT:  THANK YOU.  I APPRECIATE THAT.

 2         ALL RIGHT.  THIS IS THE TIME SET FOR SENTENCING FOR

 3    MS. YAMAGUCHI ON THE CHARGE.

 4         AND I JUST WANT TO CLARIFY FOR THE RECORD, HAVE BOTH

 5    ATTORNEYS RECEIVED THE PRESENTENCE REPORT, AND THAT WOULD BE

 6    THE SECOND REVISED PRESENTENCE REPORT?

 7              MS. ROSEN:  YES, YOUR HONOR.

 8              MR. ELLIOTT:  YES, YOUR HONOR.

 9              THE COURT:  ALL RIGHT.  AND I DO HAVE THE SENTENCING

10    MEMOS SUBMITTED BY EACH PARTY.

11         WERE THERE ANY OTHER DOCUMENTS FOR THE COURT TO RECEIVE,

12    AND I WILL NOTE THAT I HAVE RECEIVED THE VICTIM IMPACT

13    STATEMENT HAS JUST BEEN HANDED TO ME.  ARE THERE ANY OTHER

14    DOCUMENTS?

15              MR. ELLIOTT:  I DON'T BELIEVE SO, YOUR HONOR.

16              MS. ROSEN:  NO, YOUR HONOR.

17              THE COURT:  ALL RIGHT.  LET ME JUST LOOK AT THIS.

18         ALL RIGHT.  I HAVE REVIEWED THE VICTIM IMPACT STATEMENT.  I

19    DO UNDERSTAND THAT THERE IS A REQUEST FOR THE VICTIM TO MAKE A

20    STATEMENT TO THE COURT, MS. ROSEN, AND I WOULD BE GLAD TO HEAR

21    THAT NOW BEFORE WE GET STARTED.

22              MS. ROSEN:  SURE.  THANK YOU, YOUR HONOR.

23              MR. AXELBAUM:  YOUR HONOR, GOOD MORNING.

24         MARC AXELBAUM, PILLSBURY, WINTHROP, SHAW & PITTMAN,

25    REPRESENTING YAMATO SCIENTIFIC AMERICA, INC.
```

1    AND I'M ONLY ENTERING THE APPEARANCE AS COUNSEL FOR THE

2    VICTIM HERE.  AND THE PERSON AND REPRESENTATIVE, JOERG

3    DUPPENTHALER, IS THE PRESIDENT OF THE YAMATO SCIENTIFIC.

4         THE COURT:  THANK YOU.  GOOD MORNING.

5         MR. DUPPENTHALER:  GOOD MORNING.  I'M JOERG

6    DUPPENTHALER, AS MENTIONED BY MARC.

7    SINCE 2014 HERE IN -- I'M PRESIDENT OF YSA SINCE MARCH OF

8    2014.  I AM A FREE CITIZEN WITH RESIDENCE IN JAPAN FOR OVER

9    30 YEARS.

10    YOUR HONOR, I WOULD LIKE TO THANK YOU FOR LETTING ME

11    ADDRESS THE COURT.  AND PLEASE, I WOULD LIKE TO APOLOGIZE TO

12    READ FROM THE PAPER BECAUSE I'M VERY NERVOUS.  THIS PLACE, FOR

13    ME, IS A PLACE I SHOULD NEVER BE.

14         THE COURT:  MANY PEOPLE FEEL THAT WAY.

15         MR. DUPPENTHALER:  I WAS HIRED TO REPLACE

16    MS. YAMAGUCHI WHO WAS PRESIDENT UNTIL MARCH 2014 WITH THE TASK

17    TO REVERSE THE DECLINING PERFORMANCE OF YSA, WHICH IS REFERENCE

18    TO YAMATO SCIENTIFIC AMERICA.

19    WHEN I GOT TO YSA I IMMEDIATELY HAD TO REALIZE

20    MS. YAMAGUCHI CREATED A COMPANY GREEN BIKE LAB.  I WOULD MAYBE

21    LATER ON REFER TO THIS GREEN BIKE LAB AS GBL.

22    DURING HER YSA PRESIDENCY, THIS COMPANY WAS CREATED.  THEN

23    BY HER OWN COMPANY, GBL, A DISTRIBUTOR TO STEAL PROPERTY AND

24    REVENUES FROM YSA.  SHE ALSO STARTED TO IMPORT 140 ELECTRO

25    BIKES STORING THEM IN OUR WAREHOUSE.

1    AND AGAIN, NOT ENOUGH, SHE ALSO STARTED TO IMPORT

2    COMPETITION PRODUCTS AND INSTEAD OF YAMATO PRODUCTS, THE

3    COMPETITION PRODUCTS, BUT THEN PROMOTED TO HER PERSONAL ACCOUNT

4    INSTEAD OF SELLING OUR OWN YAMATO PRODUCTS.

5    I FURTHER HAD TO REALIZE THE COMPANY WAS IN DISARRAY, BOOKS

6    NOT IN ORDER, AND EMPLOYEES IN SHOCK AFTER BEING COMPELLED TO

7    WORK FOR A COMPANY, GREEN BIKE LAB, THAT DID NOT ACTUALLY

8    EMPLOY THEM, A COMPANY THAT WAS BASICALLY NOT FUNCTIONING FOR

9    ITSELF FOR OVER A YEAR.

10   WHEN I FIRST ARRIVED AT YSA I HAD SIX STOCK LEFT, BUT

11   WITHIN TWO MONTHS, I HAD TO DISMISS THREE MORE STAFF DUE TO

12   FRAUD AND COLLABORATION WITH MS. YAMAGUCHI.  I HAD TO RESTART

13   YSA WITH THREE EMPLOYEES TO REBUILD AND SAVE YSA.

14   OVER THE PAST TWO YEARS, I HAD AN INCREDIBLE HARDSHIP.  50

15   TO 70 HOURS WORKDAY, INCLUDING EVERY SATURDAY AND SUNDAY, JUST

16   IN ORDER TO HELP THE GOVERNMENT ON INVESTIGATING

17   MS. YAMAGUCHI'S ERROR, CRIMES, PROSECUTION, AND IN PARALLEL, TO

18   REBUILD YSA.

19   I WOULD HAVE LIKED TO SEE MS. YAMAGUCHI TURN HERSELF IN

20   IMMEDIATELY AFTER HER DISMISSAL FROM YSA INSTEAD OF LETTING ME

21   SUFFER ONE AND A HALF YEARS TO FINALLY ADMIT HER FRAUD.

22   MS. YAMAGUCHI USED THE POSITION OF TRUST AT YSA TO CREATE,

23   AS I MENTIONED BEFORE, A COMPANY, GBL, AND OUT OF THE CASH

24   ASSETS, THE CUSTOMERS AND RESOURCES OF YSA AND THEN STOLE FROM

25   YSA FOR OVER A YEAR.

```
 1        AS FAR AS I KNOW, GREEN BIKE LAB HAD NO REAL INDEPENDENT

 2   FOUNDATION AND CERTAINLY WAS NOT A LEGITIMATE DISTRIBUTOR OF

 3   YSA PRODUCTS.

 4        SHE CONTINUED TO TRY TO STEAL FROM YSA AFTER

 5   REPRESENTATIVES OF YAMATO JAPAN TERMINATED HER FOR CAUSE AFTER

 6   GETTING SOME INFORMATION FROM A FORMER EMPLOYEE THAT SHE WAS

 7   STEALING FROM THE COMPANY.

 8        HER FRAUD WAS ELABORATE.  FOR THE FIRST TWO MONTHS OF HER

 9   FRAUD, SHE SOLD PRODUCTS TO CUSTOMERS AND THEN GREEN BIKE LAB

10   WOULD REACT RETROACTIVELY, RECEIVE A COMMISSION OF SALES

11   DESPITE HAVING NOT INTERACTED WITH THE CUSTOMER AT ALL.

12        SHE DID THIS USING FAKE PURCHASE ORDERS, FAKE MEMOS FOR

13   GREEN BIKE LAB TO YSA REQUESTING THE COMMISSION THAT GBL HAD

14   SUPPOSEDLY EARNED FROM THE SALES, CHECKS CUT TO GREEN BIKE LAB

15   FROM YSA'S BANK ACCOUNT TO PAY FOR THESE COMMISSIONS, EVEN

16   THOUGH GREEN BIKE LAB HAD DONE ABSOLUTELY NOTHING TO EARN THEM.

17        THEN IN PHASE TWO OF THE FRAUD, SHE HAD CERTAIN YSA

18   EMPLOYEES WHO FEARED HER, REDIRECTED ORDERS THAT CAME INTO YSA

19   TO GREEN BIKE LAB.  VIRTUALLY EVERY ORDER THAT CAME IN HAD TO

20   BE REDIRECTED TO THIS TRADED COMPANY, TAKING A 40 PERCENT CUT

21   OFF OF EACH SALE.

22        SHE DID THIS USING A FAKE DISTRIBUTORSHIP AGREEMENT BETWEEN

23   YSA AND GBL.  IT'S NOT YSA WHO MADE THIS DISTRIBUTION

24   AGREEMENT, IT WAS HERSELF IN HER POSITION TO MAKE HER OWN

25   COMPANY THE DISTRIBUTOR TO STEAL MONEY FROM THE COMPANY.
```

 1          THE 40 PERCENT DISCOUNT SHE GAVE HERSELF WAS BIGGER THAN

 2     ANY YSA BIGGEST CUSTOMER.  SHE DID NOT SEEM TO EARN THIS MONEY.

 3     SHE DID SOME BAD THINGS TO TAKE IT THOUGH.

 4          FOR EXAMPLE, AT MS. YAMAGUCHI'S DIRECTION, A YSA EMPLOYEE

 5     WOULD RESPOND TO ORDERS OR INQUIRIES, E-MAIL FROM CUSTOMERS BY

 6     TELLING THEM THAT ALL FUTURE CORRESPONDENCE COULD BE HANDLED BY

 7     THE DISTRIBUTORSHIP.  EVERYTHING WAS CHANNELED THROUGH THIS

 8     COMPANY BY HER ORDER.

 9          THIS YSA EMPLOYEE WOULD THEN CC E-MAIL ADDRESS TO GREEN

10     BIKE LAB, AND THEN THE SAME EMPLOYEE WOULD RESPOND ON THE SAME

11     STRING PRETENDING TO BE ANOTHER PERSON.  SHE WAS A YSA PERSON

12     AND HAD TWO FUNCTIONS.  ONE HAD FOR YSA, ONE HAD FOR GREEN BIKE

13     LAB.

14          MANY EMPLOYEE HAD TO SPEAK ON THE PHONE.  SHE WAS CHANGING

15     HER VOICE.  AT ONE SIDE, SHE WAS A YSA EMPLOYEE TELLING THEM

16     YOU HAVE TO ORDER FROM GREEN BIKE LAB.  AND THEN THE CUSTOMER

17     CAME BACK AND SHE CHANGED HER VOICE.  AND THIS WAS FACILITATED

18     WITH MS. YAMAGUCHI, SHE PROVIDED AN IPHONE WITHIN THE OFFICE

19     WITH A GREEN BIKE LAB PHONE NUMBER.

20          THE SAME EMPLOYEE DOCUMENT OF MS. YAMAGUCHI STEALING THE

21     SALES IN MORE OR LESS REALTIME IN A VERY CLEAR SPREADSHEET SHE

22     MAINTAINED FOR YAMAGUCHI.

23          ALSO SHE DID HIDE FROM MS. YAMAGUCHI THE FACT THAT SHE WAS

24     KEEPING A COPY FOR HERSELF.  THAT'S WHY WE HAVE ALL THE TRACES,

25     HOPEFULLY THAT SOME DAY SHE COULD SHOW IT TO SOMEONE POWERFUL

1    ENOUGH TO DO THE RIGHT THING, END THE FRAUD AND NOT FIRE THE

2    EMPLOYEE IN THE PROCESS.  BECAUSE IN HER POSITION, SHE HAD

3    ENOUGH POWER TO HIRE PEOPLE WHO DID NOT FOLLOW HER

4    INSTRUCTIONS.

5         SHE ALSO SOMETIMES DIVERTED SALES FROM CUSTOMERS WHO WANTED

6    TO BUY YAMATO PRODUCTS, AND INSTEAD SOLD THEM PRODUCTS MADE BY

7    YAMATO'S COMPETITOR.  SHE IMPORTED YAMATO COMPETITOR PRODUCT,

8    STORED EVERYTHING IN OUR WAREHOUSE.

9         SHE STORED 140 ELECTRIC BIKES IN OUR WAREHOUSE.  OUR

10   WAREHOUSE AT TIMES LOOKED LIKE A WORKSHOP FOR A BIKE COMPANY.

11   AND THE STUFF, SALARIES OF THE STUFF HAVE BEEN USED TO CREATE

12   HER BUSINESS.  USING THE REVENUES, PROFIT FROM YAMATO TO BUILD

13   HER COMPANY.

14        MS. YAMAGUCHI TOOK AWAY YSA CUSTOMER ADDRESSES, AND THROUGH

15   HER SYSTEMATIC DIVERTING INCOMING CUSTOMERS TO GREEN BIKE LAB,

16   THE CUSTOMERS WERE EDUCATED TO HAVE GBL AS THE FIRST CONTACT

17   ADDRESS.  THAT MEANS NOT ANYMORE YSA, YAMATO WAS THE CONTACT IN

18   THE DATABASE.

19        THE CUSTOMER HAD GREEN BIKE LAB IN THE DATABASE.  SO EVEN

20   AFTER SHE WAS TERMINATED, CUSTOMERS WERE GOING NOT TO YSA BUT

21   TO GREEN BIKE LAB.

22        AT THAT POINT, AND WE HAVE EVIDENCE OF THIS, CUSTOMER WOULD

23   CALL FOR A YAMATO PRODUCT.  SHE IS GOING TO TELL LIES, WE DON'T

24   HAVE STOCK, THIS PART IS OBSOLETE, THE QUALITY IS NOT GOOD,

25   THEY HAVE A PRODUCTION PROBLEM, THEY HAVE A SHIPPING PROBLEM,

1    AND THEN STARTED TO TRY TO SELL HER COMPETING PRODUCT WHICH SHE

2    HAS IMPORTED.

3         AND THIS, OVER MORE THAN ONE YEAR AFTER SHE WAS ALREADY

4    TERMINATED.  NEEDLESS TO SAY THAT MY BUSINESS WAS EVEN MORE

5    DIFFICULT TO SUSTAIN TO GO ON.

6         SHE COVERED UP WHAT SHE WAS DOING OVER A LENGTHY PERIOD OF

7    TIME.  CONCEALING GREEN BIKE LAB POSITION AS NUMBER ONE

8    DISTRIBUTOR.  I HAD TO COME HERE AS A REPRESSED ENTITY FOR

9    YAMATO JAPAN TO VISIT YSA OFFICES IN FEBRUARY 2014 JUST BEFORE

10   EVERYTHING BLOW UP.

11        I ASK MS. YAMAGUCHI FOR A DISTRIBUTOR SALES REPORT WHO THEN

12   ASKED AN EMPLOYEE FOR IT.  I LEARNED THE FOLLOWING FACTS

13   THROUGH OUR INVESTIGATIONS:

14        THE EMPLOYEE RUN THE REPORT WHICH SHOWED GREEN BIKE LAB AS

15   THE NUMBER ONE DISTRIBUTOR WITH THE HIGHEST AMOUNT OF SALES.

16   NEEDLESS TO SAY, SHE TOOK EVERYTHING AWAY THERE.

17        THE EMPLOYEE BROUGHT THE REPORT TO MS. YAMAGUCHI RIGHT

18   AWAY.  AT THAT TIME, I WAS IN A PRIVATE MEETING WITH

19   MS. YAMAGUCHI IN THE OFFICE.  MS. YAMAGUCHI THEN WENT BACK TO

20   THE EMPLOYEE'S DESK AND ASKED HER TO TAKE OUT $350,000 OUT OF

21   THIS REPORT, SHIFT THIS TO OTHER WELL KNOWN DISTRIBUTORS TO

22   MAKE IT LOOK, GBL, NOT VERY IMPORTANT.

23        THE EMPLOYEE TOLD MS. YAMAGUCHI THAT JAPAN MIGHT FIND OUT

24   ABOUT THIS AND MS. YAMAGUCHI REPLIED THAT THEY WILL NOT FIND

25   IT.

1      THE EMPLOYEE THEN MADE THE REQUESTED EDITS AND PROVIDED

2   MS. YAMAGUCHI WITH THE REVISED VERSION OF THE DISTRIBUTED

3   REPORT WHICH SHE THEN SHOWED IT TO ME.

4      MS. YAMAGUCHI WOULD REGULARLY ASK THE EMPLOYEE TO DELETE

5   GREEN BIKE LAB RELATED MATERIALS FROM A YSA COMPUTER OR AS A

6   PAPER DOCUMENT.  SO NOTHING CAN BE FOUND.  AND SO THERE IS NO

7   TRACE.

8      PARTICULARLY BEFORE REPRESENTATIVES FROM YAMATO JAPAN

9   VISITED SHE INSTRUCTED TO ERASE ALL TRACES OF GREEN BIKE AND TO

10   DELETE EVERYTHING ABOUT GREEN BIKE BECAUSE THE JAPANESE ARE

11   COMING IN AND MIGHT LOOK AT THINGS.  PHYSICAL COVERUP.

12      WE LEARNED THROUGH OUR INVESTIGATION THAT WHEN I CAME TO

13   VISIT AS A REPRESSED ENTITY OF YAMATO JAPAN, MS. YAMAGUCHI

14   ASKED AN EMPLOYEE TO COVER UP 140 BIKES IN THE WAREHOUSE,

15   COVERED UP COMPETITION PRODUCTS WHICH WERE IMPORTED ILLEGALLY.

16   THESE BIKES AND COMPETITION PRODUCTS WERE COVERED WITH TARPS IN

17   ORDER THAT IT'S NOT VISIBLE.

18      AN INCIDENT AFTER FIRING, I WOULD LIKE TO MENTION, WHICH IS

19   VERY PAINFUL FOR THE WHOLE COMPANY WHAT HAS HAPPENED.  AFTER

20   SHE WAS TERMINATED AND HER KEYS TO THE OFFICE WERE TAKEN, SHE

21   WENT BACK TO THE OFFICE OVER THE WEEKEND AND REMOVED VARIOUS

22   ITEMS ALL WITHOUT ANY PROPER AUTHORIZATION.

23      IN OTHER WORDS, SHE BROKE INTO THE OFFICE, AND IN FACT,

24   MS. YAMAGUCHI, HER HUSBAND, HER SON, HER DAUGHTER, WITH THE

25   HELP OF AN EMPLOYEE WHO OPENED THE WAREHOUSE FOR THIS

1    UNAUTHORIZED ENTRY, THIS WAS ON WEDNESDAY MARCH 12TH, THE DAY

2    SHE WAS FIRED, THE DAY SHE WAS FIRED, AT 9:40 P.M. AT NIGHT

3    UNTIL 1:50 A.M. IN THE MORNING, THEY WERE BREAKING INTO THIS

4    WAREHOUSE, REMOVED ITEMS FROM THE WAREHOUSE.

5         MS. YAMAGUCHI WENT BACK TO OUR OFFICES AND VIRTUALLY IT WAS

6    EMPTY.  WHEN I ARRIVED THERE, ALMOST THE DESK WAS EMPTY.

7    DOCUMENTS WERE DESTROYED, EVIDENCE WAS DESTROYED.  AND IN THE

8    END WHEN SHE WALKS OUT, HANDS FULL OF COMPUTER, PERSONAL

9    COMPUTER, PERSONAL ITEMS FROM YSA.

10        AND WHY I CAN SAY THIS, THERE IS -- IN THE WAREHOUSE ARE

11   FOUR CAMERAS.  I WAS TOLD THESE CAMERAS ARE NOT WORKING.

12   MISTAKE.  EVERYTHING IS DOCUMENTED.  I SPENT HOURS AND DAYS TO

13   GO THROUGH EACH MINUTE.

14        YOU CAN IMAGINE IF YOU HAVE A VIDEO SYSTEM OVER YEARS.  YOU

15   HAVE TO FIND THE POSITIONS WHERE SOMETHING HAPPENED.

16   EVERYTHING IS DOCUMENTED ON THIS VIDEO.

17        WHEN MS. YAMAGUCHI LEFT, SHE TOOK THREE COMPUTERS OUT OF

18   THE YSA OFFICE.  AND I CAN TELL YOU, EVERYBODY, EVERY FAMILY

19   MEMBER HAD SOMETHING.

20        I WOULD LIKE TO MAKE A CONCLUSION HERE.  I AM FINALLY

21   PLEASED AFTER ONE AND A HALF YEARS OF HARDSHIP, WE ARE AT THIS

22   POINT, AND MS. YAMAGUCHI PLEADED GUILTY AND SHE HAS AGREED TO

23   MAKE RESTITUTION.  AND THE RESTITUTION AMOUNT WHICH IT STAYS

24   NOW, IS NEVER COVERING MY COST, MY EXPENSES.

25        AND I APPRECIATE THE COURT'S CONSIDERATION AND ALSO THE

1    TIME AND EFFORT THAT THE GOVERNMENT HAS SPENT FOR THIS CASE.  I

2    THINK IT'S TOTALLY UNFAIR.

3         I HOPE THAT THE COURT WILL CONSIDER THE THINGS I HAVE SAID

4    IN DECIDING ON THE SENTENCE.  I HOPE ALSO THAT THE COURT WILL

5    MAKE SURE THE FORFEITURE AND RESTITUTION ARE PAID QUICKLY AND

6    FULLY.

7         AND I MUST SAY HERE, IF I READ THE SENTENCE, NO, THE

8    DEFENDANT YAMAGUCHI'S SENTENCE MEMORANDUM, TO ME THIS IS A

9    JOKE.  THIS IS NOT THE TRUTH.

10        I AM FINISHED.

11             THE COURT:  THANK YOU, MR. DUPPENTHALER.  THANK YOU.

12   I GREATLY APPRECIATE WHAT YOU HAVE PROVIDED TO THE COURT.

13        ALL RIGHT.  WELL, WE HAVE A LOT TO TALK ABOUT HERE.  LET ME

14   JUST BEGIN WITH SOME OF THE OTHER FORMALITIES.

15        IS ARRAIGNMENT FOR JUDGMENT WAIVED?

16             MR. ELLIOTT:  SO WAIVED.

17             THE COURT:  ALL RIGHT.  AND HAVE YOU AND YOUR CLIENT

18   READ AND DISCUSSED THE PRESENTENCE REPORT AND THE SENTENCING

19   MEMORANDUM FROM THE UNITED STATES ATTORNEY?

20             MR. ELLIOTT:  YES.

21             THE COURT:  ARE THERE ANY OBJECTIONS TO THE

22   PRESENTENCE REPORT?

23             MR. ELLIOTT:  NO, YOUR HONOR.

24             THE COURT:  ALL RIGHT.

25        MS. YAMAGUCHI, DO YOU KNOW WHAT YOU'VE BEEN CONVICTED OF?

1        THE DEFENDANT:  YES.

2        THE COURT:  ALL RIGHT.

3     YOU HAVE PLED GUILTY AND BEEN CONVICTED OF ONE COUNT OF

4  MAIL FRAUD IN VIOLATION OF 18 U.S. CODE SECTION 1341.

5     THIS CRIME CARRIES A MAXIMUM PRISON TERM OF 20 YEARS, A

6  MAXIMUM FINE OF $250,000, MAXIMUM SUPERVISED RELEASE OF THREE

7  YEARS AND A MANDATORY SPECIAL ASSESSMENT OF $100.

8     THE GUIDELINE CALCULATIONS ARE AS FOLLOWS.  THIS IS A BASE

9  LEVEL OFFENSE OF SEVEN WITH SPECIFIC OFFENSE CHARACTERISTICS

10  REGARDING THE AMOUNT OF THE THEFT TO BE -- PROVIDE FOR AN

11  ADDITIONAL 12 LEVEL ENHANCEMENT.

12     YOU ARE BEING PROVIDED A DECREASE OF THREE LEVELS FOR YOUR

13  ACCEPTANCE OF RESPONSIBILITY FOR A TOTAL OFFENSE LEVEL OF 16.

14  YOUR CRIMINAL HISTORY IS 1.

15        THERE ARE NO OBJECTIONS TO THE GUIDELINE CALCULATION?

16        MR. ELLIOTT:  NO, YOUR HONOR.

17        THE COURT:  ALL RIGHT.

18     THIS IS A PLEA ENTERED PURSUANT TO RULE 11 (C)1(A) AND (B),

19  AND THUS MAY NOT BE WITHDRAWN BASED UPON THE COURT'S SENTENCE;

20  IS THAT CORRECT?

21        MS. ROSEN:  THAT'S CORRECT.

22        MR. ELLIOTT:  THAT'S CORRECT.

23        THE COURT:  ALL RIGHT.  AFTER CONSIDERING THE

24  FINDINGS AND THE CALCULATIONS IN THE PRESENTENCE REPORT, I

25  CALCULATE THE ADVISORY GUIDELINE RANGE TO BE 21 TO 27 MONTHS

1    WITH SUPERVISED RELEASE RANGE OF 1 TO 3 YEARS, A FINE RANGE OF

2    $10,000 TO $95,000, AND A SPECIAL ASSESSMENT OF $100.

3            IS ALL OF THAT CORRECT?

4                MR. ELLIOTT:  YES, YOUR HONOR.

5                MS. ROSEN:  YES, YOUR HONOR.

6                THE COURT:  ALL RIGHT.

7        I GUESS I'M GOING TO START WITH SOME COMMENTS SO THAT

8    COUNSEL CAN REACT TO THEM.

9        I AM VERY DISAPPOINTED IN THE RECOMMENDATION OF THE

10   PROBATION DEPARTMENT, AND UNLESS I HEAR SOMETHING THAT IS

11   UTTERLY SURPRISING AND UNEXPECTED, I MUST COMPLETELY AND

12   UTTERLY DISREGARD IT.

13       I MUST SAY THAT I AM SHOCKED THAT ONE WOULD SUGGEST THAT

14   MS. YAMAGUCHI SHOULD BE GIVEN A VARIANCE DOWNWARD BECAUSE OF

15   THE SUPPORT OF HER FAMILY, WHEN IN FACT AFTER HEARING FROM THE

16   VICTIM AND READING THE REST OF THIS REPORT, IT APPEARS CLEAR TO

17   THE COURT THAT THE FAMILY ARE HER COMPATRIOTS IN CRIME, NOT A

18   SUPPORTIVE LAW ABIDING FAMILY.

19       AND SO UNLESS THERE'S SOMETHING THAT I HAVE MISSED

20   ENTIRELY, I FIND THE RECOMMENDATION TO BE OFFENSIVE TO THE

21   COURT AND TO THE VICTIM.

22       AND I SHARE WITH MR. DUPPENTHALER HIS SHOCK AND DISBELIEF

23   THAT THERE WOULD BE A CONSIDERATION OF ANY VARIANCE IN THIS

24   CASE UNLESS IT WOULD BE AN UPWARD VARIANCE WHICH I AM WILLING

25   TO CONSIDER AFTER WHAT I'VE HEARD.

```
1          AND I WOULD -- I ALWAYS HOPE THAT A CASE CAN BE LIMITED TO

2    A GUIDELINE RANGE, BUT I FIND THE FACTS OF THIS CASE TO BE

3    QUITE CONCERNING AND VERY SERIOUS.

4          SO WITH THAT, IS THERE ANYTHING ELSE THE PROBATION OFFICER

5    WOULD LIKE TO ADD?

6               PROBATION OFFICER:  OTHER THAN THE REASONS FOR THE

7    REVISION WAS PRIMARILY BECAUSE OF THE RESTITUTION.  THE LOSS

8    AMOUNT WAS AGREED UPON BY BOTH PARTIES.  IT'S JUST TO,

9    BASICALLY, FOR LACK OF A BETTER WORD, ELEVENTH HOUR WAS WHEN

10   THEY FINALLY CAME UP WITH THE RESOLUTION, SO I FINALLY WENT

11   PROACTIVE AND FINALLY WENT AHEAD WITH THE SECOND REVISION.

12              THE COURT:  I APPRECIATE THAT.  IT WAS UNCLEAR TO ME

13   IN THE REPORT WHETHER THERE'S A REQUEST FOR FORFEITURE.  I

14   DIDN'T KNOW IF THERE WERE ASSETS TO FORFEIT.

15              PROBATION OFFICER:  IT'S A MONEY JUDGMENT,

16   YOUR HONOR, FOR THE FORFEITURE THAT WAS INSTITUTED.

17              THE COURT:  WELL, I SEE THE RESTITUTION, BUT

18   RESTITUTION AND FORFEITURE ARE TWO DIFFERENT THINGS.

19              MS. ROSEN:  THAT'S CORRECT, YOUR HONOR.

20        MY UNDERSTANDING IS THAT THE COURT ALREADY ENTERED A

21   FORFEITURE MONEY JUDGMENT ORDER AND THAT YOU'VE ALREADY SIGNED

22   THAT.  SO THE FORFEITURE IS ALL SET.

23              THE COURT:  SO THERE'S NOTHING MORE.

24              MS. ROSEN:  NOTHING MORE NEEDS TO BE DONE WITH

25   RESPECT TO THAT AND YOU HAVE THE RESTITUTION FIGURES THAT THE
```

```
 1   PARTIES HAD AGREED TO AND WHAT THE BASIS FOR THAT IS.

 2              THE COURT:  ALL RIGHT.

 3              MR. ELLIOTT:  JUST FOR THE RECORD, THAT WAS FOR THE

 4   AMOUNT OF LOSS.

 5              THE COURT:  ALL RIGHT.

 6        WELL, THE UNITED STATES ATTORNEY IS RECOMMENDING LOW

 7   GUIDELINE AND PROBATION IS RECOMMENDING SIX MONTHS, AND

 8   MS. YAMAGUCHI IS RECOMMENDING HOME DETENTION.

 9        SO LET ME HEAR FIRST FROM THE DEFENSE.

10              MR. ELLIOTT:  THANK YOU VERY MUCH, YOUR HONOR.

11        THIS WAS AND IT IS A DIFFICULT CASE, AND WE APPRECIATE

12   PROBATION'S INPUT.  I APPRECIATE THE COURT'S INPUT, AND THE

13   VICTIM'S STATEMENTS.

14        MS. YAMAGUCHI HAD WORKED FOR THIS COMPANY FOR SOME TIME AND

15   SHE HAS ABSOLUTELY NO CRIMINAL HISTORY WHATSOEVER.  IT'S A

16   PERPLEXING CASE FOR ME TO ARGUE AT THIS POINT OTHER THAN TO SAY

17   THAT THE MINUTE I GOT INVOLVED AND WENT OVER AND MET WITH THE

18   GOVERNMENT AND EXPLAINED THIS SITUATION TO HER, SHE ACCEPTED

19   RESPONSIBILITY IMMEDIATELY.  SHE TOOK AND COOPERATED

20   IMMEDIATELY WITH MYSELF AND WITH COUNSEL.

21        WE ENTERED INTO A PLEA AGREEMENT.  SHE WAS RELEASED.  SHE'S

22   BEEN EXEMPLARY ON RELEASE.  SHE WAIVED INDICTMENT.  SHE ENTERED

23   INTO THE PLEA AGREEMENT IN GOOD FAITH.

24        WITH REGARD TO THE PLEA AGREEMENT, WE DID AGREE TO PAY THE

25   ATTORNEY'S FEES AND COSTS WHICH WAS IN THE PLEA AGREEMENT.  I
```

1    WOULD NOTE IN LIGHT OF THE STATEMENTS THAT WERE MADE AND IN

2    LIGHT OF OUR SUBSEQUENT STIPULATION TO THE REMAINING AMOUNT,

3    THAT I RECEIVED THE AMOUNT OF THE INITIAL BILLS THE AFTERNOON

4    AFTER WE HAD ENTERED THE PLEA.

5         SO I WAS SOMEWHAT SURPRISED WITH THE AMOUNT OF THE

6    REQUESTED ATTORNEY'S FEES AND COSTS.  BUT -- AND THEN THERE WAS

7    ADDITIONAL AMOUNTS REQUESTED DOWN THE ROAD.

8         NONETHELESS, MR. AXELBAUM AND MYSELF WERE ABLE TO MEET AND

9    DISCUSS ON MULTIPLE OCCASIONS IN GOOD FAITH TO STIPULATE TO A

10   NUMBER.  AND MY CLIENT REALLY WASN'T INVOLVED, SHE WASN'T

11   SAYING I DON'T WANT TO PAY THAT, SHE WASN'T SAYING -- SHE WAS

12   SAYING, DO THE RIGHT THING, I WANT TO MOVE FORWARD.

13        AND I WAS JUST, YOU KNOW -- AND AGAIN, I DIDN'T THINK IT

14   WAS GOING TO COME UP, BUT IT DID KIND OF COME UP IN THE VICTIM

15   IMPACT STATEMENT AND THE VICTIM STATEMENTS.

16        NONETHELESS, SHE IS AND HAS BEEN FROM DAY ONE, WILLING TO

17   PAY FULL RESTITUTION, WHATEVER IT WAS.  AND SHE STILL IS.

18        WITH REGARD TO, CLEARLY THE ACCEPTANCE OF RESPONSIBILITY

19   IS, I DON'T THINK WITHOUT QUESTION, THE REPORT, I UNDERSTAND

20   AND I DO A LOT MORE STATE WORK THAN I DO FEDERAL WORK.  AND SO

21   I OBVIOUSLY TAKE, I'M NOT SAYING I TAKE OFFENSE WITH THE

22   COMMENTS OF MY BRIEF BEING A JOKE, BUT THIS CASE --

23             THE COURT:  I WASN'T COMMENTING ON YOUR --

24             MR. ELLIOTT:  NO, NO, NOT FROM THE COURT, IN THE

25   VICTIM STATEMENT.

```
 1              THE COURT:  OH, OKAY.
 2              MR. ELLIOTT:  I HONESTLY BELIEVE BASED UPON
 3   EVERYTHING I KNOW ABOUT HER, THAT THIS WAS OUT OF CHARACTER.
 4   THERE'S NO DOUBT ABOUT THAT.  AND THERE ARE A LOT OF OTHER
 5   FACTORS WHICH I'M NOT GOING TO GO INTO TODAY AS TO HOW THINGS
 6   HAPPENED OR WHY.
 7         SHE HAS TAKEN RESPONSIBILITY AND HAS BEEN DOING SO, WHICH
 8   HAS MADE IT DIFFICULT FOR ME.  AND AGAIN, IT'S NOT ABOUT ME,
 9   IT'S ABOUT THE COURT AND THE VICTIM.
10         WHAT WE ARE ASKING FOR, AGAIN, I BELIEVE THE RECOMMENDATION
11   FROM PROBATION WAS VERY FAVORABLE AND I UNDERSTAND THE COURT
12   TAKES DISAGREEMENT WITH IT.  BUT THE GOAL OF THESE CASES, AND
13   CERTAINLY MAYBE SO MORE IN STATE COURT THAN IN FEDERAL COURT,
14   IS TO MAKE THE VICTIM WHOLE.
15         AND MY ARGUMENT HERE IS THAT IF SHE -- IF SHE IS SENT TO
16   PRISON, THAT'S ANOTHER 21 MONTHS, 27 MONTHS AWAY FROM HER
17   FAMILY.  BUT MORE IMPORTANTLY, AWAY FROM THE ABILITY TO PAY
18   RESTITUTION.
19         AND SHE, AS I INDICATED IN MY REPLY BRIEF, SHE'S ALREADY
20   MADE ARRANGEMENTS TO PAY $155,000 OF THE OUTSTANDING LOSS WHICH
21   IS PART OF THE FORFEITURE, AND THAT CAN HAPPEN ALMOST
22   IMMEDIATELY.  IN FACT, WE ATTEMPTED TO MAKE EFFORTS TO PAY IT
23   BEFORE SENTENCING, BUT IT SEEMED LIKE IT WAS BETTER TO WAIT
24   UNTIL AFTER, BASED UPON VARIOUS THINGS.
25         IN STATE COURT, IN SITUATIONS, WE PAY RESTITUTION AT THE
```

1    EARLIEST POSSIBLE OUTCOME, AND OBVIOUSLY THAT RESULTS IN A MORE

2    FAVORABLE, NOT ALWAYS, BUT A MORE FAVORABLE CAST OF LIGHT ON

3    THE CASE WHEN YOU COME TO SENTENCING.

4         SO I WOULD HONESTLY ASK THE COURT TO STRONGLY CONSIDER EVEN

5    IN LIGHT OF YOUR COMMENTS, PROBATION FOR HER.  AND I DON'T

6    THINK SHE IS A BAD PERSON, AND I DON'T THINK SHE DESERVES TO GO

7    TO STATE PRISON, OR FEDERAL PRISON.  I DON'T BELIEVE THAT IS

8    GOING TO, CERTAINLY IT'S NOT GOING TO ALLOW HER TO PAY OFF THE

9    RESTITUTION FASTER.

10        AND THE CORPORATE LOSS, AGAIN, WE HAVE STIPULATED TO AND

11   SHE'S GOING TO MAKE EVERY EFFORT TO PAY THAT ENTIRE AMOUNT AS

12   QUICKLY AS SHE CAN.

13        WITH REGARD TO -- AND AGAIN, BRIEFLY, HER MEDICAL CONDITION

14   IS NOT SEVERE, BUT IT IS POINTED OUT, HER HUSBAND HAD QUADRUPLE

15   BYPASS SURGERY.  HE'S STILL RECUPERATING.  HE DOES REQUIRE

16   ASSISTANCE.  THAT WOULD BE A BURDEN TO TAKE HER AWAY FROM HIM

17   AT THIS POINT.  AND SHE'S ALSO TREATING FOR HER VARIOUS

18   CONDITIONS WHICH COULD BE AGGRAVATED, OBVIOUSLY, IN A CUSTODIAL

19   SITUATION.

20        SO I WOULD ASK THE COURT TO CONSIDER THAT, AND IF THAT IS

21   TOO FAR BELOW THE COMFORT LEVEL, THEN I WOULD ASK THE COURT TO

22   STRONGLY CONSIDER PROBATION'S RECOMMENDATION AS WELL.

23             THE COURT:  ALL RIGHT.  THANK YOU.

24        MS. ROSEN.

25             MS. ROSEN:  THANK YOU, YOUR HONOR.

1    THIS IS NOT ABOUT WHETHER THE DEFENDANT IS A BAD PERSON,

2    THIS IS ABOUT THE DEFENDANT'S ACTS AND THE DEFENDANT'S CONDUCT

3    IN THIS CASE WAS BAD.

4    AS YOU HEARD FROM MR. DUPPENTHALER, AND I WON'T GO AT

5    LENGTH INTO IT BECAUSE THE COURT IS OBVIOUSLY AWARE OF THE

6    CONDUCT, BUT IT INCLUDES DEFRAUDING HER EMPLOYER, USING HER

7    POSITION TO DIVERT PROFITS THAT SHOULD HAVE GONE TO HER

8    EMPLOYER, TO HERSELF, TO CREATE AND START HER OWN BUSINESS WITH

9    HER SON.

10    THAT WAS THE PURPOSE OF HER CRIME.  AND SHE USED HER

11    POSITION TO INVOLVE OTHER EMPLOYEES IN THAT CONDUCT, TO INVOLVE

12    HER FAMILY MEMBERS IN THAT CONDUCT, AND TO REALLY VIOLATE THE

13    TRUST OF HER EMPLOYER.  AND THAT'S WHAT WE ARE HERE TO PUNISH

14    HER FOR.

15    AND THE FACT IS THAT A SENTENCE NEEDS TO BE FAIR AND JUST

16    AND SHE NEEDS TO BE TREATED SIMILARLY TO OTHER DEFENDANTS WHO

17    HAVE PARTICIPATED OR COMMITTED THE SAME KINDS OF FRAUDS.

18    AND IN THIS CASE, SHE IS SIMILARLY SITUATED TO THOSE.  HER

19    LENGTHY EMPLOYMENT HISTORY, THAT'S WHAT EVERY WHITE COLLAR

20    DEFENDANT HAS.  THAT'S WHAT ENABLES THEM TO DO WHITE COLLAR

21    CRIME.

22    THE FACT SHE HAS SUPPORTED FAMILY, AS YOUR HONOR POINTED

23    OUT SHE REALLY ROPED THEM INTO HER CRIME, AND MORE OVER DOESN'T

24    SEEM FAIR TO TREAT HER BETTER THAN DEFENDANTS WHO DON'T HAVE

25    SUPPORTIVE FAMILIES.

1    HER LACK OF CRIMINAL HISTORY IS WELL ACCOUNTED FOR IN

2    CRIMINAL HISTORY CATEGORY 1, IT'S FOR THOSE WITH THE LOWEST

3    RISK OF RECIDIVISM.  SO THAT'S ALREADY BEEN TAKEN INTO ACCOUNT.

4        THE REASON WE ASK FOR A LOW RECOMMENDATION IN THIS CASE IS

5    BECAUSE OF HER SWIFT AND COMPLETE ACCEPTANCE OF RESPONSIBILITY.

6    WE DIDN'T ASK FOR AN EXTRA VARIANCE BASED ON THAT, BECAUSE AS

7    YOU HEARD FROM MR. DUPPENTHALER AND AS WE PUT IN OUR SENTENCING

8    MEMORANDUM, SHE DID NOT TURN HERSELF IN.  SHE CONTINUED, AS

9    MR. DUPPENTHALER SAID, TO TRY TO DIVERT CLIENTS WHO CALLED HER,

10   EVEN AFTER SHE WAS FIRED, BECAUSE THEY HAD THE PHONE NUMBER FOR

11   GREEN BIKE LAB TO COMPETITORS OF YSA RATHER THAN TELL THEM SHE

12   NO LONGER WORKED FOR THE COMPANY.

13       WHEN FIRST CONFRONTED BY THE FBI, SHE DENIED HER CRIMES AND

14   LIED ABOUT HER CONDUCT.  IT IS TRUE, HOWEVER, THAT ONCE SHE GOT

15   AN ATTORNEY AND ONCE SHE WAS PROVIDED THE FULL DISCOVERY OF HER

16   CRIME, SHE DID AT THAT POINT QUICKLY ADMIT HER RESPONSIBILITY,

17   SHE DID PLEAD GUILTY RIGHT AWAY, SHE DID WAIVE INDICTMENT, SHE

18   DID SAVE THE UNITED STATES A LOT OF RESOURCES IN HER EARLY PLEA

19   AND SHE DID AGREE TO FULL RESTITUTION AS WELL AS FORFEITURE.

20       SO FOR THOSE REASONS, WE THINK A LOW END SENTENCE IS

21   APPROPRIATE, BUT WE THINK A GUIDELINE SENTENCE IS APPROPRIATE

22   IN THIS CASE BECAUSE WE REALLY DON'T THINK SHE'S OUT OF THE

23   HEARTLAND OF OTHER DEFENDANTS WHO HAVE COMMITTED THIS TYPE OF

24   CRIME.

25       AND WITH THAT, YOUR HONOR, WE WOULD SUBMIT IT.

1          THANK YOU

2                THE COURT:  THANK YOU.

3          WELL, YOU KNOW, IN CASES LIKE THIS WITH ANY SORT OF

4     EMBEZZLEMENT OR WHITE COLLAR CRIME WITH DIVERTING FUNDS FROM A

5     COMPANY BY A LONG-TERM EMPLOYEE, I ALWAYS LISTEN TO FIND OUT

6     WHAT THE UNDERLYING REASON WAS.  IT DOESN'T EVER EXCUSE OR

7     JUSTIFY THE CRIME, BUT THAT KIND OF EXPLANATION CAN BE HELPFUL.

8          IN THIS CASE, YOU'VE INDICATED THAT MS. YAMAGUCHI PREFERS

9     NOT TO OFFER ANY EXCUSES OR REASONS, AND I RESPECT THAT, BUT I

10    CAN'T READ OR ASSUME THAT THERE WERE ANY.

11         WHAT I SEE IS THE REPORT OF AN INDIVIDUAL WHO HAS HAD A

12    FINANCIALLY COMFORTABLE LIFE, HAS HAD THE BENEFIT OF EDUCATION

13    AND A STABLE FAMILY, AND THERE IS ACTUALLY WITH NO REASON

14    OFFERED, THIS IS JUST A BARE CRIME.

15         AND THE AGGRAVATING CIRCUMSTANCES AND WHAT MAKE IT A

16    SERIOUS CRIME TO THE COURT UNDER THE SENTENCING FACTORS THAT I

17    MUST CONSIDER, IS THAT IT TOOK PLACE OVER AN EXTENDED PERIOD OF

18    TIME, MORE THAN A YEAR, EVEN AFTER FIRING, SHE CONTINUED TO

19    STEAL BLATANTLY FROM THE COMPANY.

20         IT WAS A SOPHISTICATED AND ELABORATE SCHEME.  IT VIOLATED

21    NOT ONLY A POSITION OF TRUST WITH THE COMPANY, BUT ASSERTED A

22    POSITION OF POWER OVER OTHER EMPLOYEES WHO HAD TO BE ROPED INTO

23    AND KEPT SILENT ON THIS SCHEME, EXCEPT OBVIOUSLY THAT DIDN'T

24    QUITE WORK OUT MAYBE AS WELL AS MS. YAMAGUCHI HAD ANTICIPATED

25    THAT IT WOULD.

1    I FIND IT PARTICULARLY SIGNIFICANT THAT AFTER SHE WAS

2    FIRED, THAT SHE, ALONG WITH HER FAMILY MEMBERS, BROKE INTO THE

3    COMPANY AND STOLE ADDITIONAL ITEMS.

4    AND SO I DO FIND IT TO BE A VERY SERIOUS CRIME.  AND I

5    AGREE WITH MS. ROSEN, THE COURT NEVER MAKES A JUDGMENT AS TO

6    WHETHER A PERSON IS A GOOD OR BAD PERSON, THAT IS NOT THE

7    PURPOSE OF THE JUSTICE SYSTEM.  I AM LOOKING AT THE CONDUCT

8    HERE AND THE SENTENCING LAWS ARE DEVELOPED TO PUNISH THE

9    CONDUCT THAT A PERSON HAS ENGAGED IN, AND WHETHER ONE IS TO

10   BECOME OR RETURN TO BEING A GOOD PERSON WITH GOOD ACTS, IS

11   REALLY IN MS. YAMAGUCHI'S HANDS.

12   I DO CONSIDER OTHER CHARACTERISTICS OF MS. YAMAGUCHI'S

13   SITUATION, CERTAINLY CONSIDERING HER AGE, HER EMPLOYMENT

14   HISTORY, HER PERSONAL HEALTH AND THE HEALTH OF HER FAMILY,

15   THOSE ARE ALL THINGS THAT I HAVE TAKEN INTO CONSIDERATION.

16   HOWEVER, THE FEDERAL PRISONS ARE NOT POPULATED JUST WITH

17   HEALTHY YOUNG PEOPLE WHO HAVE NO FAMILY OBLIGATIONS, IF THAT

18   WERE THE CASE WE WOULD BE RENTING OUT THE SPACE FOR SOME OTHER

19   PURPOSE.

20   MS. YAMAGUCHI DOES HAVE SOME MEDICAL CONCERNS, AND I TAKE

21   NOTE OF THAT, BUT NONE IS SERIOUS ENOUGH TO AFFECT THE

22   SENTENCING CONSIDERATION IN THIS CASE.

23   I'M ALWAYS CONCERNED ABOUT THE ABILITY TO PAY RESTITUTION,

24   HOWEVER IT'S NOT EXACTLY CLEAR TO ME THAT MS. YAMAGUCHI HAS ANY

25   FUTURE EMPLOYMENT POSSIBILITIES GIVEN THE NATURE OF THIS CRIME

1    AND THE SKILLS THAT SHE HAS.

2        I DON'T KNOW THAT THAT'S REALISTIC.  IT DOES APPEAR THAT

3    HER ABILITY TO PAY RESTITUTION WILL HAVE MORE TO DO WITH HER

4    REFINANCING OF HER ASSET, HER HOME, SO THAT SHE CAN PAY THIS.

5    BUT THAT WOULD BE FOR PROBATION TO WORK WITH HER ON FOR A

6    REASONABLE PAYMENT OF HER RESTITUTION.

7        I ALSO LOOK AT THE -- AND ALWAYS PRIMARILY PUBLIC SAFETY

8    AND THE NEED FOR DETERRENCE.  AND FRANKLY, I SEE NOTHING IN

9    THIS SITUATION THAT WOULD CAUSE ME TO BELIEVE THAT

10   MS. YAMAGUCHI WOULDN'T DO THIS AGAIN BECAUSE THERE WAS NOTHING

11   IN HER PAST THAT WOULD HAVE PREDICTED THAT SHE DO IT THE FIRST

12   TIME.

13       AND SO THERE'S SIMPLY NOTHING HERE THAT CAUSES ME TO FEEL

14   THAT THIS WILL NOT BE REPEATED.  THE CRIMINAL HISTORY LEVEL I

15   SUPPOSE, BUT AGAIN, SHE DEIFIED THE ODDS IN THE FIRST INSTANCE.

16       I DO BELIEVE THAT THERE NEEDS TO BE A PUBLIC DETERRENCE AS

17   WELL, AND THAT TO THE EXTENT THAT THE PUBLIC SEES THAT THIS

18   KIND OF CRIME IS NOT IGNORED AND THAT IT IS PUNISHED WITHIN THE

19   LAW, I THINK IS A VERY IMPORTANT MESSAGE TO THE COMMUNITY.

20       FIRST OF ALL, TO RESTORE FAITH TO THOSE WHO HAVE BEEN

21   VIOLATED IN THIS INSTANCE, AND TO BE A MESSAGE TO OTHERS WHO

22   MIGHT REALIZE THAT IT'S NOT JUST A PIGGY BANK FOR THEM TO REACH

23   THEIR HANDS INTO.

24       AND SO I DO THINK THAT UNDER THE 3553 FACTORS, THAT THAT IS

25   NOT IN MS. YAMAGUCHI'S FAVOR.

1    I CERTAINLY RECOGNIZE THAT BOTH PROBATION AND THE DEFENDANT

2    ARGUE THAT THE GUIDELINE RANGE IS TOO HARSH FOR THESE

3    CIRCUMSTANCES.  I THINK BASED UPON MY COMMENTS, I DO NOT FEEL

4    THAT WAY.  I CAN'T THINK OF ANY FACTORS OTHER THAN ONES THAT

5    MIGHT BE CONSIDERED UNFAIR, THAT WOULD DISTINGUISH

6    MS. YAMAGUCHI'S CIRCUMSTANCES FROM OTHERS FOR WHOM THE

7    GUIDELINES WERE DEVELOPED.

8    I RESPECT THE FACT THAT THE UNITED STATES ATTORNEY IS

9    RECOMMENDING THE LOW END OF THE GUIDELINE RANGE.  AND ALTHOUGH

10   I FEEL THAT AN INCREASED RECOMMENDATION WOULD BE MORE THAN

11   REASONABLE, I HAVE NO REASON TO GO BEYOND WHAT THE

12   UNITED STATES ATTORNEY IS RECOMMENDING TO THE COURT, WHICH

13   WOULD BE THE 21-MONTH SENTENCE.

14   AND SO BASED UPON ALL OF THESE FACTORS, IT IS THE COURT'S

15   DETERMINATION THAT THE GUIDELINE SENTENCE OF 21 MONTHS IS

16   APPROPRIATE AND NECESSARY TO PROTECT THE PUBLIC AND PROPER

17   UNDER THE CIRCUMSTANCES OF THIS CASE.

18   THE RESTITUTION AMOUNT OF $650,000 HAS BEEN AGREED UPON,

19   SOME OF THAT WILL BE PAID THROUGH THE FORFEITURE ORDER THE

20   COURT HAS ALREADY MADE AND THE REMAINDER IN REGULAR PAYMENTS.

21   THERE'S A RECOMMENDATION FOR NO FINE IN THIS CASE AND THE

22   COURT WILL ADOPT THAT.  THERE WILL BE A MANDATORY SPECIAL

23   ASSESSMENT OF $100, AND THE OTHER CONDITIONS THAT WERE

24   RECOMMENDED BY THE PROBATION DEPARTMENT WILL BE IMPOSED.

25   BEFORE I ACTUALLY IMPOSE SENTENCE, IS THERE ANYTHING ELSE

1     EITHER SIDE WOULD LIKE TO SAY?

2           MR. ELLIOTT:  I WAS JUST GOING TO POINT OUT,

3     YOUR HONOR, WITH REGARD TO HER EMPLOYMENT OPPORTUNITY, I THINK

4     SHE DOES HAVE EMPLOYMENT OPPORTUNITIES AND I DO HAVE SOME

5     DOCUMENTATION.

6        THAT BEING SAID, I WOULD SUBMIT IT AND I APPRECIATE THE

7     COURT'S TIME.  I APPRECIATE PROBATION'S TIME IN THE REPORT AND

8     I APPRECIATE THE UNITED STATES ATTORNEY'S, SEVERAL OF WHICH I

9     HAVE DEALT WITH IN THE CASE, AND I APPRECIATE THEIR TIME AS

10    WELL.  AND I WOULD SUBMIT IT ON THAT

11          THE COURT:  ALL RIGHT.

12       MS. ROSEN, ANYTHING ELSE?

13          MS. ROSEN:  NO, YOUR HONOR.

14       THE ONLY THING THAT I WOULD ADD IS THAT IF IN THE

15    RESTITUTION ORDER IT BE PAYABLE TO YAMATO SCIENTIFIC AMERICA AT

16    925 WALSH AVENUE, SANTA CLARA, CALIFORNIA, TO THE ATTENTION OF

17    JOERG DUPPENTHALER.  WHICH IS SPELLED J-O-E-R-G,

18    D-U-P-P-E-N-T-H-A-L-E-R.

19          THE COURT:  ALL RIGHT.  OKAY.  THANK YOU.

20       PURSUANT TO THE SENTENCING REFORM ACT OF 1984, IT IS THE

21    JUDGMENT OF THE COURT THAT MS. MISAKO YAMAGUCHI IS HEREBY

22    COMMITTED TO THE CUSTODY OF THE BUREAU OF PRISONS TO BE IN

23    PRISON FOR A TERM OF 21 MONTHS.

24       UPON RELEASE FROM IMPRISONMENT, THE DEFENDANT SHALL BE

25    PLACED ON SUPERVISED RELEASE FOR A TERM OF THREE YEARS.

1    WITHIN 72 HOURS OF RELEASE FROM THE CUSTODY OF THE BUREAU

2    OF PRISONS, THE DEFENDANT SHALL REPORT IN PERSON TO THE

3    PROBATION OFFICE IN THE DISTRICT TO WHICH THE DEFENDANT IS

4    RELEASED.

5    WHILE ON SUPERVISED RELEASE, THE DEFENDANT SHALL NOT COMMIT

6    ANOTHER FEDERAL, STATE OR LOCAL CRIME, SHALL COMPLY WITH THE

7    STANDARD CONDITIONS THAT HAVE BEEN ADOPTED BY THIS COURT,

8    EXCEPT THAT THE MANDATORY DRUG TESTING PROVISION IS SUSPENDED

9    AND SHALL COMPLY WITH THE FOLLOWING ADDITIONAL CONDITIONS.

10   THE DEFENDANT SHALL NOT MAINTAIN A POSITION OF FIDUCIARY

11   CAPACITY WITHOUT THE PRIOR PERMISSION OF THE PROBATION OFFICER.

12   THE DEFENDANT SHALL NOT OPEN ANY NEW LINES OF CREDIT AND OR

13   INCUR NEW DEBT WITHOUT THE PRIOR PERMISSION OF THE PROBATION

14   OFFICER.

15   THE DEFENDANT SHALL PROVIDE THE PROBATION OFFICER WITH

16   ACCESS TO ANY FINANCIAL INFORMATION, INCLUDING TAX RETURNS, AND

17   SHALL AUTHORIZE THE PROBATION OFFICER TO CONDUCT CREDIT CHECKS

18   AND OBTAIN COPIES OF INCOME TAX RETURNS.

19   THE DEFENDANT SHALL NOT BE EMPLOYED IN ANY CAPACITY IN

20   WHICH SHE IS PRESIDENT OF A CORPORATE ENTITY AND OR SELF

21   EMPLOYED WITHOUT THE PRIOR APPROVAL OF THE PROBATION OFFICER.

22   THE DEFENDANT SHALL PARTICIPATE IN A -- IS THIS REQUESTED,

23   THE LOCATION MONITORING WITH THE 21 MONTH --

24        MS. ROSEN:  NO, YOUR HONOR.

25        THE COURT:  ALL RIGHT.

```
1          THE DEFENDANT SHALL HAVE NO CONTACT WITH THE VICTIM YSA,

2     UNLESS OTHERWISE DIRECTED BY THE PROBATION OFFICER.

3          THE DEFENDANT SHALL SUBMIT TO A SEARCH OF HER PERSON,

4     RESIDENCE, OFFICE, VEHICLE OR ANY PROPERTY UNDER HER CONTROL TO

5     A SEARCH.

6          SUCH A SEARCH SHALL BE CONDUCTED BY A UNITED STATES

7     PROBATION OFFICER OR ANY FEDERAL, STATE OR LOCAL LAW

8     ENFORCEMENT OFFICER, AT ANY TIME WITH OR WITHOUT SUSPICION.

9          FAILURE TO SUBMIT TO SUCH A SEARCH MAY BE GROUNDS FOR

10    REVOCATION.  THE DEFENDANT SHALL WARN ANY RESIDENCE THAT THE

11    PREMISES MAY BE SUBJECT TO SEARCHES.

12         THE DEFENDANT SHALL COOPERATE WITH THE COLLECTION OF DNA AS

13    DIRECTED BY THE PROBATION OFFICER.

14         THE DEFENDANT SHALL NOT OWN OR POSSESS ANY FIREARMS,

15    AMMUNITION, DESTRUCTIVE DEVICES OR OTHER DANGEROUS WEAPONS.

16         IT IS FURTHER ORDERED THAT THE DEFENDANT SHALL PAY TO THE

17    UNITED STATES A SPECIAL ASSESSMENT OF $100 WHICH SHALL BE DUE

18    IMMEDIATELY.

19         WHEN INCARCERATED, PAYMENT OF CRIMINAL MONETARY PENALTIES

20    ARE DUE DURING IMPRISONMENT AT A RATE OF NOT LESS THAN $25 PER

21    QUARTER AND THE PAYMENT SHALL BE THROUGH THE BUREAU OF PRISONS

22    INMATE FINANCIAL RESPONSIBILITY PROGRAM.

23         CRIMINAL MONETARY PAYMENT SHALL BE MADE TO THE CLERK OF THE

24    UNITED STATES DISTRICT COURT.  450 GOLDEN GATE AVENUE,

25    BOX 36060, SAN FRANCISCO, CA 94102.
```

1      THE COURT FINDS THAT THE DEFENDANT DOES NOT HAVE THE

2  ABILITY TO PAY AND ORDERS THE FINE TO BE WAIVED.

3      IT IS FURTHER ORDERED THAT THE DEFENDANT SHALL PAY

4  RESTITUTION TO THE YAMATO SCIENTIFIC AMERICA LOCATED AT 925

5  WALSH AVENUE, SANTA CLARA, CALIFORNIA, 95050 IN THE AMOUNT OF

6  $650,000 WHICH SHALL BE DUE IMMEDIATELY.  WHILE INCARCERATED

7  RESTITUTION IS DUE DURING IMPRISONMENT AT A RATE OF NOT LESS

8  THAN $25 PER QUARTER AND THE PAYMENT SHALL BE THROUGH THE

9  BUREAU OF PRISONS INMATE FINANCIAL RESPONSIBILITY PROGRAM.

10      RESTITUTION PAYMENT, MS. ROSEN YOU WANT THE PAYMENTS

11  DIRECTLY TO YAMATO OR THROUGH THE COURT?  IT'S GENERALLY

12  THROUGH THE COURT.

13          MS. ROSEN:  YES, THAT'S FINE.

14      SO IT WILL BE KNOWN WHAT SHE'S PAYING.  BUT YAMATO IS THE

15  RECIPIENT OF IT.  SO WE GENERALLY PUT IN THEIR NAME AND

16  ADDRESS.

17          THE COURT:  AND RESTITUTION SHALL BE PAID TO THE

18  CLERK OF UNITED STATES DISTRICT COURT, ATTENTION FINANCIAL

19  UNIT.  450 GOLDEN GATE AVENUE, BOX 36060, SAN FRANCISCO, CA

20  94104, OF MONTHLY PAYMENTS OR AT LEAST TEN PERCENT OF EARNINGS,

21  WHICHEVER IS GREATER, TO COMMENCE NO LATER THAN 60 DAYS FROM

22  PLACEMENT ON SUPERVISION.

23      ANY ESTABLISHED PAYMENT PLAN DOES NOT PRECLUDE ENFORCEMENT

24  EFFORTS BY THE UNITED STATES ATTORNEY'S OFFICE IF THE DEFENDANT

25  HAS THE ABILITY TO PAY MORE THAN THE MINIMUM DUE.

1      AND I WILL COMMENT THAT I CONSIDER THESE AMOUNTS TO BE

2  EXTRAORDINARILY LOW AT THIS POINT.  I WILL EXPECT THAT THE

3  PROBATION DEPARTMENT, UPON RELEASE FROM CUSTODY, WILL EVALUATE

4  MS. YAMAGUCHI'S ACTUAL ABILITY TO PAY AND RETURN TO COURT IF

5  NECESSARY TO MODIFY THE TERMS OF THE PAYMENT OF RESTITUTION.

6      ANY AMOUNTS PAID THROUGH THE FORFEITURE OF COURSE ARE

7  CREDITED, AND I DON'T KNOW WHETHER THAT WAS A FORFEITURE OF A

8  PARTICULAR BANK ACCOUNT OR ANY SUM

9          MS. ROSEN:  NO, YOUR HONOR, IT WASN'T OF ANY

10  PARTICULAR ASSET IT WAS JUST OF MONEY JUDGMENT.

11          THE COURT:  ALL RIGHT.

12      AND THOSE ARE ALL THE TERMS, MS. ROSEN, THAT YOU ARE ASKING

13  FOR?

14          MS. ROSEN:  YES, YOUR HONOR.

15          PROBATION OFFICER:  YOUR HONOR, A COUPLE OF THINGS.

16      ON THE RESTITUTION, YOU HAD THE ZIP CODE AT 94104.  I THINK

17  IT'S 94102.  AND THEN ON PAGE 5 THERE IS A FORFEITURE THAT

18  SHOULD BE READ INTO THE RECORD

19          THE COURT:  OH, THANK YOU.  I WILL.

20      THE DEFENDANT'S INTEREST IN THE FOLLOWING PROPERTY SHALL BE

21  FORFEITED TO THE UNITED STATES.

22      MONEY JUDGMENT OF $309,523.98.

23      AND THAT WOULD BE ALL OF THE TERMS OF THE SENTENCE.

24      MS. YAMAGUCHI, YOU MAY APPEAL THE CONVICTION CONSISTENT

25  WITH YOUR WAIVERS IN THE PLEA.  AND IF YOU FEEL YOUR PLEA WAS

1    SOMEHOW UNLAWFUL OR INVOLUNTARY OR THERE WAS SOME OTHER

2    FUNDAMENTAL DEFECT IN THE PROCEEDINGS THAT WAS NOT WAIVED BY

3    YOUR GUILTY PLEA, ANY NOTICE OF APPEAL MUST BE FILED WITHIN

4    14 DAYS OF THE ENTRY OF JUDGMENT OR WITHIN 14 DAYS OF FILING OF

5    NOTICE OF APPEAL BY THE GOVERNMENT.

6         IF YOU CANNOT AFFORD TO PAY THE COST OF AN APPEAL OR FOR AN

7    ATTORNEY TO REPRESENT YOU ON APPEAL, YOU HAVE THE RIGHT TO

8    APPLY FOR LEAVE TO APPEAL IN FORMA PAUPERIS WHICH MEANS THAT

9    YOU CAN ASK THE COURT TO WAIVE THE FILING FEE.  ON APPEAL, YOU

10   MAY APPLY FOR COURT APPOINTED COUNSEL.

11        AND THERE'S GOING TO BE A VOLUNTARY SURRENDER DATE?

12             MS. ROSEN:  YES, YOUR HONOR.

13             THE COURT:  HAVE THE PARTIES WORKED THAT OUT?

14             MS. ROSEN:  WE WERE JUST DISCUSSING IT.

15        I SUGGESTED 60 DAYS, HE WAS SUGGESTING HE WANTED 90 DAYS.

16   SO WE WOULD DEFER TO THE COURT ON THAT, YOUR HONOR.

17             MR. ELLIOTT:  YOUR HONOR, WITH REGARD TO THAT, I

18   WOULD ASK THAT IF SHE'S HOUSED, WE WOULD ASK FOR HOUSING TO BE

19   IN NORTHERN CALIFORNIA.  AND I WOULD ASK FOR, SELF SURRENDER

20   DATE OF 90 DAYS IF THAT'S NOT TOO FAR OUT.

21             THE COURT:  I'M NOT HEARING A BIG OBJECTION FROM THE

22   UNITED STATES ATTORNEY, SO I WILL GRANT THAT REQUEST.

23        I WILL ORDER THE DEFENDANT TO VOLUNTARILY SURRENDER TO THE

24   UNITED STATES MARSHAL ON --

25             THE CLERK:  90 DAYS IS MAY 2ND, YOUR HONOR.

```
1              THE COURT:  ON MAY 2ND, 2016.  GENERALLY, THERE'S A
2     TIME OF DAY INDICATED, WHAT WOULD THAT BE?
3              PROBATION OFFICER:  2:00 P.M. YOUR HONOR.
4              THE COURT:  BY NO LATER THAN 2:00 P.M.
5         I WILL RECOMMEND TO THE BUREAU OF PRISONS THAT
6     MS. YAMAGUCHI BE HOUSED AS CLOSE TO NORTHERN CALIFORNIA AS
7     POSSIBLE.
8         IS THAT EVERYTHING?
9              MS. ROSEN:  YES, YOUR HONOR.  THANK YOU.
10             THE COURT:  ALL RIGHT.  WELL, THANK YOU ALL.
11        MS. YAMAGUCHI, I KNOW THIS IS HARD TO COME TO TERMS WITH,
12    AND I KNOW THIS SENTENCE IS FAR GREATER THAN YOU WERE
13    REQUESTING.  I KNOW YOU'VE LISTENED TO THE IMPACT ON YOUR
14    FORMER EMPLOYER AND UNDERSTAND THE SERIOUSNESS OF YOUR CRIME,
15    SO I WISH YOU THE VERY BEST.
16        ALL RIGHT.  THANK YOU ALL.
17             MS. ROSEN:  THANK YOU, YOUR HONOR.
18             MR. ELLIOTT:  THANK YOU VERY MUCH, YOUR HONOR.
19             MR. DUPPENTHALER:  YOUR HONOR, THANK YOU.
20             THE COURT:  THANK YOU, MR. DUPPENTHALER.  THANK YOU
21    FOR BEING HERE.
22        (WHEREUPON, THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)
23
24
25
```

1

2

3

4                    **<u>CERTIFICATE OF REPORTER</u>**

5

6

7

8           I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13           THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 5/18/16