UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,
Plaintiff,

v.

MISAKO YAMAGUCHI,
Defendant.

Case No. 15-cr-00395-BLF-1

**ORDER DENYING DEFENDANT'S MOTION TO VACATE HER CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. § 2255**

[Re: ECF 58]

Defendant Misako Yamaguchi ("Yamaguchi") has filed a motion to vacate her conviction and sentence pursuant to 28 U.S.C. § 2255. *See* ECF 58. Yamaguchi is a lawful permanent resident of the United States who asserts that she was deprived of effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution when her plea-stage attorney failed to advise her of the immigration consequences of her plea of guilty to an aggravated felony. The Government opposes Yamaguchi's motion, arguing that she has failed to satisfy the requirements of *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Supreme Court recently reiterated *Strickland*'s high bar in the context of a defendant's challenge to a guilty plea based on asserted ineffective assistance of counsel related to the immigration consequences of the plea. *See Lee v. United States*, 137 S.Ct. 1958, 1964 (2017).

On November 2, 2017, the Court held an evidentiary hearing on Yamaguchi's § 2255 motion. Three witnesses testified at the hearing and were subject to cross-examination, including (1) Yamaguchi herself; (2) Yamaguchi's counsel at the time of her plea and sentencing, Kirk Elliott; and (3) Yamaguchi's counsel during her civil restitution proceedings, Carl Lindstrom. For the reasons that follow, Yamaguchi's motion to vacate her conviction and sentence pursuant to § 2255 is DENIED. The Court also declines to issue a certificate of appealability.

United States District Court
Northern District of California

## I. BACKGROUND

### A. Yamaguchi Pleads Guilty to Mail Fraud

On August 5, 2015, the Government filed an Information alleging that Misako Yamaguchi had violated 18 U.S.C. § 1341 (Mail Fraud), and requested forfeiture under 18 U.S.C. § 981(a)(1)(C) and 20 U.S.C. § 2461(c). *See generally* ECF 1 ("Information").[1] The charges were based on Yamaguchi's scheme to defraud her employer out of hundreds of thousands of dollars.[2] From February 2013 to April 2014, Yamaguchi was the president of Yamato Scientific America ("YSA"), a company that sells scientific laboratory equipment. YSA's parent company, Yamato Scientific, is located in Japan. Yamaguchi and her son owned a separate company called Green Bike Lab ("Green Bike"), which was in the business of selling electric bicycles.

The Government's investigation revealed that Yamaguchi had executed a distribution agreement that made Green Bike a preferred distributor of YSA's equipment. Under the agreement, YSA would (1) grant Green Bike a 40 percent commission on all sales of YSA lab equipment; and (2) sell the lab equipment to Green Bike at a 40 percent discount. When customers contacted YSA to purchase lab equipment, Yamaguchi fraudulently redirected them to purchase the equipment through Green Bike directly. Green Bike then sold the lab equipment at full price to customers but only passed on 60 percent of the revenues from its sales to YSA. Thus, the scheme caused YSA to pay fraudulent commissions to Green Bike and deprived YSA of profits to which it was entitled. The Government alleged, and ultimately proved, that Yamaguchi defrauded YSA out of approximately $309,523.98.

Throughout the criminal proceedings against her, Yamaguchi was represented by retained counsel Kirk Elliott ("Elliott"). While represented, Yamaguchi waived her right to prosecution by Indictment. Then, on October 27, 2015, Yamaguchi executed a written plea agreement in open court in which she pled guilty to the Information which charged her with one count of mail fraud

---

[1] All references to ECF refer to the docket in criminal case number 5:15-cr-00395 in the Court's Electronic Case Filing system.

[2] The facts regarding Yamaguchi's illegal scheme are taken from the Government's offer of proof at the Change of Plea hearing at which Yamaguchi pled guilty to mail fraud and confirmed the veracity of these factual allegations. *See* ECF 69-2, 17:9-19:1; 19:20-22. These facts are also set forth in Yamaguchi's Plea Agreement. *See* ECF 69-1.

in violation of 18 U.S.C. § 1341 for carrying out the fraudulent scheme described above. *See* ECF 69-1 ("Plea Agreement"). The written plea agreement is governed by Federal Rules of Criminal Procedure 11(c)(1)(A) and 11(c)(1)(B). *Id*.

In relevant part to her § 2255 motion, the Plea Agreement that Yamaguchi signed contained the following statement:

> I acknowledge that pleading guilty may have consequences with respect to my immigration status if I am not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which I am pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and I understand that no one, including my attorney or the district court, can predict to a certainty the effect of this conviction on my immigration status. I nevertheless affirm that I want to plead guilty regardless of any immigration consequences that may result from my guilty plea, even if the consequence is my automatic removal from the United States.

*Id*. at ¶ 1.

The Court also discussed the potential immigration consequences of Yamaguchi's guilty plea at the Change of Plea hearing on October 27, 2015.

> The Court: Have you discussed the possible immigration consequences of a guilty plea with your attorney?
>
> The Defendant: Yes, your Honor.
>
> The Court: Do you understand that if you're not a citizen of the United States, in addition to any other possible penalties that you're facing, a plea of guilty may subject you to deportation, exclusion from admission into the United States, or voluntary departure and prevent you from obtaining U.S. Citizenship?
>
> The Defendant: Yes, your Honor.
>
> The Court: Do you understand that in addition to any other consequences of this conviction, the immigration – I'm sorry, I don't know that there's a possible deportation here. I don't know that.

ECF 69-2 ("Plea Hearing Transcript") 15:13-16:1.

In the Plea Agreement, Yamaguchi also gave up her right to appeal her conviction, the judgment, and orders of the Court, as well as to appeal any aspect of her sentence including orders relating to forfeiture or restitution. Plea Agreement ¶ 4. Finally, although Yamaguchi agreed not to file any collateral attack on her conviction or sentence, including a petition under 28 U.S.C. § 2255 or 28 U.S.C. 2241, she expressly reserved her right to claim that her counsel was

ineffective in connection with the negotiation of the Plea Agreement or the entry of the guilty plea. *Id.* ¶ 5. The Court confirmed Yamaguchi's understanding of these provisions with Yamaguchi and her counsel on the record at the Change of Plea hearing. *See* Plea Hearing Transcript 13:2-13; 14:12-15:4.

On February 2, 2016, this Court sentenced Yamaguchi to 21 months in prison followed by three years of supervised release. *See* ECF 19 (criminal minutes). Yamaguchi was ordered to pay $650,000 in restitution and forfeiture of $309,523.98, as well as a mandatory special assessment of $100. *Id.* Judgment was entered on February 8, 2016. *See* ECF 20.

**B. Yamaguchi's Motion to Vacate Pursuant to § 2255**

On February 14, 2017, Yamaguchi, proceeding *pro se*, filed a motion to vacate or set aside her conviction and sentence pursuant to 28 U.S.C. § 2255. *See* ECF 58 ("§ 2255 motion"). In the motion and accompanying memorandum, Yamaguchi argues that she is entitled to relief because her counsel, Kirk Elliott, provided ineffective assistance of counsel in connection with the negotiation of her plea. *Id.*; *see also* ECF 66 ("Memorandum"). Specifically, Yamaguchi asserts that (1) she did not knowingly and intelligently waive her right to appeal or collaterally attack her conviction; and (2) she was not apprised that her plea of guilty to an aggravated felony rendered her subject to "automatic" deportation from the United States. *See* Memorandum at 7-9. The Court ordered the Government to file a response to Yamaguchi's motion. *See* ECF 59.

Before the Government's response was due, Yamaguchi filed a motion requesting the Court to enter an order for discovery, to hold an evidentiary hearing on her motion to vacate, and to appoint counsel. *See* ECF 61. The Court denied Yamaguchi's motion for appointment of counsel, but ordered the Government to file a response to Yamaguchi's motion for discovery and an evidentiary hearing. *See* ECF 65. Yamaguchi also filed a motion to proceed *in forma pauperis* ("IFP"), which the Court denied without prejudice for being incomplete. *See* ECF 62, 64.

Upon receipt of the Government's opposition to Yamaguchi's request for an evidentiary hearing, ECF 67, the Court denied Yamaguchi's motion for discovery without prejudice. The Court also deferred ruling on the motion for an evidentiary hearing until after the Government submitted its substantive response to the underlying § 2255 motion to vacate. *See* ECF 68. The

United States District Court
Northern District of California

Government then filed its substantive response to Yamaguchi's *pro se* § 2255 motion on April 20, 2017. *See* ECF 69.

That same day, the Court requested briefing from the Parties regarding whether the matter should be stayed pending the U.S. Supreme Court's decision in *Lee v. Unites States*, No. 16-327, a case that the Supreme Court had already granted certiorari and heard oral argument. *See* ECF 70. As further discussed below, *Lee* involves the relevant question of whether it is always irrational for a noncitizen defendant with longtime legal resident status and extended familial and business ties to the United States to reject a plea offer notwithstanding strong evidence of guilt, if that plea would result in mandatory and permanent deportation.

The Government opposed the entry of a stay pending a decision in *Lee*, arguing that the Supreme Court was only examining the second prong of *Strickland v. Washington*, 466 U.S. 668, 686 (1984). ECF 71. Because Yamaguchi failed to present evidence on either prong of *Strickland*, including whether the performance of Yamaguchi's counsel was deficient, there was no need for the Court to consider whether Yamaguchi had also demonstrated prejudice. *Id*. at 2. Given the overwhelming evidence that Elliott had performed adequately in advising Yamaguchi of the immigration consequences of her plea, the Government argued that it was unnecessary to stay the proceedings for *Lee*, "as that case deals exclusively with the question of prejudice." *Id*. Yamaguchi filed a reply in support of her motion to vacate, but did not address the implications of *Lee*. ECF 72.

On June 23, 2017, the Supreme Court handed down its decision in *Lee v. United States*, 137 S.Ct. 1958 (2017). In reversing the Sixth Circuit, the Supreme Court held that the defendant had demonstrated a reasonable probability that he would not have pled guilty if he had known that doing so would lead to mandatory deportation. *Id*. at 1967. Thus, the erroneous advice of defendant's counsel at the plea negotiating stage as to the deportation consequences of the guilty plea constituted prejudice and amounted to ineffective assistance of counsel. *Id*. at 1969. Recognizing *Lee*'s relevance to the circumstances before the Court on Yamaguchi's § 2255 motion, the Court *sua sponte* reconsidered its order denying Yamaguchi's motion for appointment of counsel. *See* ECF 73.

The Court appointed James McNair Thompson ("Thompson") as counsel for Yamaguchi and terminated the pending motion for an evidentiary hearing without prejudice to being refiled once Yamaguchi had conferred with counsel. ECF 73, 74. After various difficulties associated with meeting with Yamaguchi, who was in prison at FCI-Dublin, Thompson was able to confer with Yamaguchi and determined that her § 2255 motion was in her interest to pursue. *See* ECF 79. Although Yamaguchi chose to stand on her *pro se* § 2255 motion to vacate as originally filed, Thompson filed a renewed motion for an evidentiary hearing. *See* ECF 80. The Court permitted the Government to file a response, and heard oral argument on whether an evidentiary hearing was necessary on two separate occasions: October 10, 2017, and October 24, 2017. *See* ECF 85, 90.

In order to aid its determination as to whether an evidentiary hearing was necessary, the Court ordered that Yamaguchi had implicitly waived the attorney-client privilege. *See* ECF 84. The waiver was limited to the narrow issue raised in Yamaguchi's § 2255 motion that her plea-stage attorney, Kirk Elliott, was ineffective within the meaning of the Sixth Amendment by failing to advise her of the immigration consequences of her plea. *Id*. (citing *Lambright v. Ryan*, 698 F.3d 808 (9th Cir. 2012)). Yamaguchi's implied waiver permitted the Government to submit Elliott's declaration pertaining to his advice to Yamaguchi concerning the immigration consequences of her guilty plea. *See* ECF 86 ("Elliott Decl.").

Yamaguchi also filed three declarations and supporting exhibits in the record that called Elliott's testimony into question. *See* ECF 87. Yamaguchi submitted the declaration of Carl Lindstrom, an attorney who represented her in connection with the civil judgment entered against her based on her guilty plea in the criminal proceedings. ECF 87 at 3-4 ("Lindstrom Decl.") ¶ 2. In his declaration, Lindstrom testified that he had communications with Elliott where he specifically asked whether Elliott had advised Yamaguchi about potential adverse immigration consequences arising from the plea. *Id.* ¶ 4. Lindstrom further testified that Elliott "replied that he did not think there were any [immigration consequences]." *Id.* ¶ 5. Yamaguchi also submitted the declaration of Valerie Zukin, an immigration attorney who provided testimony regarding the deportation and removal consequences of pleading guilty to 18 U.S.C.§ 1341 with a loss amount in excess of $10,000. ECF 87 at 5-8 ("Zukin Decl.") ¶ 7. Finally, Yamaguchi's appointed counsel

James Thompson filed a declaration detailing his own conversation with Elliott that underscored Elliott's failure to understand the automatic removal and exclusion consequences of Yamaguchi's plea of guilty to an aggravated felony. ECF 87 at 10-15 ("Thompson Decl.") ¶ 14.

Concerned by the inconsistent testimony before the Court regarding Elliott's advice to Yamaguchi during her plea negotiations, the Court granted Yamaguchi's motion for an evidentiary hearing. *See* ECF 89; *see also* 28 U.S.C. § 2255(b) ("Unless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to *no* relief, the court shall cause notice thereof to be served upon the United States attorney [and] grant a prompt [evidentiary] hearing thereon.") (emphasis added). An evidentiary hearing was held on November 2, 2017, where the Court heard testimony from Elliott, Lindstrom, and Yamaguchi herself.

Based on the record before the Court, including the testimony given at the evidentiary hearing and the argument of counsel, Yamaguchi's motion to vacate her conviction and sentence pursuant to § 2255 is DENIED. As explained below, Elliott's representation of Yamaguchi in connection with her plea negotiations was deficient, but Yamaguchi has failed to show resulting prejudice.

## II. LEGAL STANDARD

A federal prisoner may file a motion to vacate, set aside, or correct his or her sentence on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The prisoner is entitled to a hearing on his § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

The Sixth Amendment right to counsel attaches to a defendant's decision of whether or not to accept a plea offer. *See Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir. 2002). Therefore, a claim of ineffective assistance of counsel applies to counsel's advice to a defendant regarding whether to accept or reject a plea offer. A claim for ineffective assistance of counsel in a § 2255 motion is governed by the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 686

(1984). In order to prevail, the defendant must show: (1) that counsel's representation fell below the range of competence demanded of attorneys in criminal cases; and (2) that the defendant was prejudiced by counsel's representation. *Id.* at 687. Although *Strickland* was decided in the context of a capital sentencing proceeding, the Supreme Court has made clear that the same two-part test also governs challenges to guilty pleas based on ineffective assistance of counsel. *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *accord Lee v. United States*, 137 S.Ct. 1958, 1964 (2017).

Courts may address the two prongs of the *Strickland* test in whichever order is most efficient and need not address one prong if the other prong is lacking. 466 U.S. at 697. The reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In order to demonstrate prejudice under the second prong, the defendant must "show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. However, when a defendant challenges a guilty plea, counsel's "deficient performance arguably led not to a judicial proceeding of disputed reliability, but rather to the forfeiture of a proceeding itself." *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000). "When a defendant alleges his counsel's deficient performance led him to accept a guilty plea rather than go to trial, we do not ask whether, had he gone to trial, the result of that trial 'would have been different' than the result of the plea bargain." *Lee*, 137 S.Ct. at 1965. Instead, the defendant can show prejudice by demonstrating a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

Specifically, when a defendant challenges a guilty plea based on failure to be advised of the virtual certainty of deportation or removal, the defendant must demonstrate a reasonable probability that, had he known of such immigration consequences, he would have negotiated a better plea offer or would have rejected the plea and proceeded to trial. *See United States v. Rodriguez-Vega*, 797 F.3d 781, 788 (9th Cir. 2015). The Supreme Court recently clarified that when an attorney's errors involve the defendant's understanding of the consequences of pleading guilty, the defendant need not necessarily show that he would have been better off going to trial. *Lee*, 137 S.Ct. at 1965. This is because the prejudice inquiry focuses on a defendant's

decisionmaking, which may not turn solely on the likelihood of a conviction after trial. *Id*. at 1966. Thus, even if a defendant's prospects of acquittal at trial are "grim," the Supreme Court held that it is not *per se* irrational for a defendant to reject a plea offer in favor of trial if deportation is a "determinative issue" and corroborating evidence of prejudice is present. *Id*. at 1968-69. It is in light of this recent guidance from the nation's highest court that this Court considers whether Yamaguchi is entitled to post-conviction relief.

## III. DISCUSSION

Yamaguchi's § 2255 motion sets forth two grounds for ineffective assistance of counsel. *See* § 2255 motion; Memorandum. Before turning to Yamaguchi's claim regarding the immigration consequences of her guilty plea, the Court briefly addresses Yamaguchi's argument that Elliott did not adequately inform her of the appellate rights that she waived in the Plea Agreement.

### A. Waiver of Appellate Rights

In her § 2255 motion, Yamaguchi asserts that she waived all rights to appeal her sentence and "waived any post-conviction relief" in the Plea Agreement. *See* ECF 66 at 3. However, this assertion is not an accurate description of the waiver in Yamaguchi's Plea Agreement. Yamaguchi goes on to argue that the waiver should not apply to a collateral attack based upon ineffective assistance of counsel. *Id*. The Government does not argue that Yamaguchi waived her right to collaterally attack her conviction and sentence on the grounds of ineffective assistance of counsel at the plea negotiating stage. *See generally* ECF 69. Rather, the Government interprets the first ground of Yamaguchi's § 2255 motion as an allegation that her counsel did not adequately inform her of the *appellate* rights waived in her plea deal. *Id*. at 3.

The thrust of Yamaguchi's first ground for relief appears to be aimed at a waiver of her rights to post-conviction relief, not her rights to a direct appeal. Yamaguchi submits that she was not "specifically nor not [sic] fully apprised by counsel of the meaning of the term 'collateral attack' or what a '2255' was, or how it could impact upon her after sentencing." *See* ECF 58 at 5. As a result, she argues that her waiver of her post-conviction rights was not knowing and voluntary. *Id*. Yamaguchi's arguments are irrelevant, because the Plea Agreement makes clear

that Yamaguchi expressly *reserved* the right to attack her conviction and sentence based on ineffective assistance of counsel in connection with the negotiation and entry of her guilty plea. Yamaguchi signed and executed a Plea Agreement in open court that stated:

> I agree to give up my right to appeal my conviction, the judgment, and orders of the Court. I also agree to waive any right I have to appeal any aspect of my sentence, including any orders relating to forfeiture and or restitution.

Plea Agreement ¶ 4. With respect to other post-conviction relief, the Plea Agreement stated:

> I agree not to file any collateral attack on my conviction or sentence, including a petition under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, *except that I reserve my right to claim that my counsel was ineffective in connection with the negotiation of this Agreement or the entry of my guilty plea*. I also agree not to seek relief under 18 U.S.C. § 3582.

Plea Agreement ¶ 5 (emphasis added). Based on the explicit language of the Plea Agreement, the Court finds that Yamaguchi agreed to give up her rights to appeal her conviction, judgment, and sentence, but reserved her right to challenge her guilty plea in a § 2255 motion based on ineffective assistance of counsel.[3]

To the extent that Yamaguchi argues that her waiver of appellate rights in the Plea Agreement was involuntary, she presents no evidence to satisfy either prong of *Strickland*. As the Government points out, Yamaguchi does not even allege that Elliot deceived her in any way regarding her waiver of appellate rights, or that Elliott somehow believed that Yamaguchi did not understand the concept of waiving such rights. In fact, the only evidence in the record supports a finding that Yamaguchi's waiver of her appellate rights was informed and voluntary. During the plea colloquy at Yamaguchi's Change of Plea hearing, the Court specifically addressed Yamaguchi's understanding of the waiver:

> The Court: Mr. Elliot, is this your signature on the plea agreement?
>
> The Defendant: Yes.

[3] The Court notes although a defendant may expressly waive the statutory right to bring a § 2255 motion challenging the conviction or sentence, a claim that ineffective assistance of counsel rendered the waiver involuntary may not be waived. *See Washington v. Lampert*, 422 F.3d 864, 871 (9th Cir. 2005), *cert. denied*, 574 U.S. 1074 (2006).

The Court: And have you discussed this plea agreement fully and completely with Ms. Yamaguchi including the provisions regarding waiver of appeal?

Mr. Elliott: I have.

The Court: And have you discussed with Ms. Yamaguchi each of the elements to each count to which she's pleading guilty?

Mr. Elliot: Yes.

The Court: And do you feel you have answered all of her questions about the plea agreement?

Mr. Elliott: Yes.

The Court: And in your opinion does Ms. Yamaguchi understand the plea agreement in its entirety including the provisions for waiver of appeal?

Mr. Elliott: Yes, she does.

Plea Hearing Transcript at 14:12-15:4, ECF 69-2.

The Court also confirmed with Yamaguchi that she understood the terms of the waiver:

The Court: In paragraph 4, you also agree to give up your right to appeal your conviction, the judgment, and orders of the Court, and you give up your right to appeal your sentence. Do you understand?

The Defendant: Yes.

The Court: You also agree in paragraph 5 not to file any collateral attack on your conviction or sentence, except you reserve the right to claim that your attorney was ineffective in connection with the negotiations or this agreement or entry of your guilty plea. Do you understand that?

The Defendant: Yes.

Plea Hearing Transcript at 13:2-13, ECF 69-2.

With respect to her waiver of appellate rights, there is no evidence of Elliott's deficient performance or that Yamaguchi was prejudiced by any allegedly erroneous advice regarding waiver of appellate rights. Indeed, that appointed counsel for Yamaguchi did not pursue any waiver argument evidences the Court's understanding that Yamaguchi was merely arguing the uncontroversial point that she did not waive the rights that she now asserts in her § 2255 motion. As explained above, the Plea Agreement makes clear that Yamaguchi expressly reserved her right

to challenge her conviction and sentence pursuant to § 2255 for ineffective assistance of counsel in connection with the negotiation and entry of her guilty plea. *See* Plea Agreement ¶ 5.

Accordingly, Yamaguchi's motion to vacate on grounds of waiver of her appellate rights is DENIED. Because Yamaguchi did not waive her rights to bring an ineffective assistance of counsel claim pursuant to § 2255 in connection with her plea, the Court next considers Yamaguchi's primary claim that she was denied the effective assistance of counsel with respect to the immigration consequences of pleading guilty to an aggravated felony.

**B. Immigration Consequences**

Yamaguchi claims that her plea-stage attorney, Kirk Elliott, provided ineffective assistance of counsel in violation of the Sixth Amendment for failing to advise her of the immigration consequences of her guilty plea. *See* § 2255 motion; Memorandum. In order to prevail, Yamaguchi must establish both prongs set forth in *Strickland*, 466 U.S. at 687.

The Court has reviewed the entire evidentiary record in this case, including the underlying criminal proceedings and the evidence presented at the November 2, 2017 evidentiary hearing. The Court concludes that although Yamaguchi has established that Elliott's representation fell below an objective standard of reasonableness, Yamaguchi has failed to demonstrate that she was prejudiced by his deficient performance. Yamaguchi's motion to vacate her conviction and sentence pursuant to § 2255 is therefore DENIED.

**1. Deficient Performance**

Yamaguchi argues that Elliott failed to advise her that pleading guilty to mail fraud pursuant to 18 U.S.C. § 1341 at a loss amount in excess of $10,000 constituted an aggravated felony which is a "deportable crime." *See* Memorandum at 7. Yamaguchi further alleges that she believed her prison and probation sentence by the Court was the "full punishment" and that she was never advised that deportation automatically flowed from her conviction. *Id.* at 8. At the evidentiary hearing, Yamaguchi testified that she did not even hear about the "deportation issue" until she was in prison at FCI-Dublin. *See* ECF 94 ("Evidentiary Hearing Transcript") 54:21-24.

Elliott denies Yamaguchi's allegations, testifying that he advised her of the serious immigration consequences of her plea. He testified that he explicitly told Yamaguchi that the

conviction carried a "high likelihood" of deportation and that she should "assume that she would be deported" if she pled guilty. ECF 86 ("Elliott Decl.") ¶ 4; *see also* Evidentiary Hearing Transcript 12:11-12 ("I said you must assume you will be deported, period.") The Court first discusses the relevant law under the first prong of *Strickland* in these circumstances, and then turns to the evidence to determine whether Elliott's advice was constitutionally ineffective.

The first prong of *Strickland*, also known as the "ineffective" or "deficient" performance prong, requires the Court to evaluate whether a criminal attorney's representation fell below an objective standard of reasonableness. 466 U.S. at 688; *see also Rodriguez-Vega*, 797 F.3d at 786. Yamaguchi's burden on this prong is heavy, as *Strickland* instructs the reviewing court to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689. However, both the Supreme Court and the Ninth Circuit have clarified the relevant standard for defense counsel advising a non-citizen defendant on the immigration consequences of a guilty plea. *See Padilla v. Kentucky*, 559 U.S. 356, 369 (2010); *Rodriguez-Vega*, 797 F.3d at 786.

In *Padilla*, the Supreme Court explained that "[w]hen the law is not succinct and straightforward… a criminal defense attorney need do no more than advise a noncitizen that pending criminal charges may carry a risk of adverse immigration consequences." 559 U.S. at 369. If, however, the deportation consequences are "truly clear," then "the duty to give correct advice is equally clear." *Id.* In *Rodriguez-Vega*, the Ninth Circuit added its gloss that where the law is explicit and clear such that "the conviction renders removal virtually certain, counsel must advise his client that removal is a virtual certainty." 797 F.3d at 786; *see also United States v. Bonilla*, 637 F.3d 980, 984 (9th Cir. 2011) ("A criminal defendant who faces almost certain deportation is entitled to know more than that it is *possible* that a guilty plea could lead to removal; he is entitled to know that it is a virtual certainty.") (emphasis in original).

**a. Yamaguchi's Deportation or Removal was Virtually Certain**

Whether Elliott's performance was deficient depends, in part, on whether the law at the time of Yamaguchi's plea was clear and explicit regarding the immigration consequences of her guilty plea. The Ninth Circuit explained in *Rodriguez-Vega* that "[w]here the immigration statute

or controlling case law expressly identifies a crime of conviction as a ground for removal, the deportation consequence is truly clear." 797 F.3d at 786 (internal citation and quotation omitted). Here, Valerie Zukin's declaration sheds some light on the deportation consequences of a § 1341 conviction with a loss amount in excess of $10,000. *See* Zukin Decl. ¶ 7. Zukin explains that Yamaguchi's conviction renders her deportable under immigration laws for having committed a fraud or deceit related aggravated felony. *Id.* ¶ 9. In *Matter of Babaisakov*, 24 I&N Dec. 306 (BIA Sept. 28, 2007), the Board of Immigration Appeals held that a federal conviction for a violation of 18 U.S.C. §1341 where the loss to the victim exceeds $10,000, is an aggravated felony for immigration purposes under INA §101(a)(43)(M)(i), 8 U.S.C. § 1101(a)(43)(M)(i). *Id.* ¶ 12. In this case, Yamaguchi's plea of guilty to mail fraud pursuant to 18 U.S.C.§ 1341 included a stipulation that she "defrauded [her] employer, YSA, out of approximately $309,523.98." *Id.* In addition, Zukin explains that noncitizens convicted of aggravated felonies are statutorily barred from most forms of discretionary relief from removal. *Id.* ¶ 15.

In light of *Rodriguez-Vega* as well as the facts in the record, the Court is satisfied that the relevant immigration statute expressly identifies Yamaguchi's conviction as a ground for removal. *See* 8 U.S.C. §§ 1101(a)(43)(M); § 1227(a)(2)(A)(iii). Thus, Elliott "was required to advise [Yamaguchi] that her conviction rendered her removal virtually certain, or words to that effect." *Rodriguez-Vega*, 797 F.3d at 786 (citing *Bonilla*, 637 F.3d at 984). The Government does not contest that the law was clear that Yamaguchi's deportation or removal was virtually certain as a result of her guilty plea, and concedes that the criteria set forth in *Rodriguez-Vega* applies to this case. *See* Evidentiary Hearing Transcript 77:8-16. Rather, the Government urges the Court to find that Elliott's statement to Yamaguchi that she should "assume that she will be deported," is equivalent to virtual certainty. *Id.* Therefore, the Court's inquiry under the first prong of *Strickland* is limited to determining whether Elliott advised Yamaguchi that her removal was "virtually certain, or words to that effect." 797 F.3d at 786.

**b. Elliott's Performance was Ineffective**

The Court has reviewed the entire evidentiary record in this case, including the testimony of Elliott, Lindstrom, and Yamaguchi presented at the November 2, 2017 evidentiary hearing.

Given the inconsistencies in the witness testimony, it is not immediately clear what actually occurred in the conversations between Yamaguchi and Elliott during the plea negotiations. However, the Court does not credit Yamaguchi's testimony that Elliott never mentioned the possibility of *any* immigration consequences to her. As discussed further below, the Court need not determine Lindstrom's credibility because this issue can be resolved by focusing on the totality of the advice that Elliott admits giving. Thus, the Court focuses solely on Elliott's own account of what he advised Yamaguchi concerning the immigration consequences of her plea, and concludes that his advice—even as he describes it—fell below the standard of objective reasonableness set forth in *Rodriguez-Vega*. For the reasons that follow, the Court finds that Yamaguchi has satisfied the first prong of her ineffective assistance of counsel claim under *Strickland*.

Before turning to the evidence, the Court notes that the Ninth Circuit was explicit in *Rodriguez-Vega* that "[t]he government's performance in including provisions [about immigration consequences] in the plea agreement, and the court's performance at the plea colloquy, are simply irrelevant to the question whether *counsel's* performance fell below an objective standard of reasonableness." 797 F.3d at 787; *cf. Lee v. United States*, 137 S. Ct. at 1968 n.4 (2017) (stating that although several courts have recognized that "a judge's warnings at a plea colloquy may undermine a claim that the defendant was prejudiced by his attorney's misadvice," a claim of ineffective assistance of counsel extends to "advice specifically undermining the judge's warnings themselves").

In the Government's opposition to Yamaguchi's motion to vacate, which admittedly was filed prior to the development of the full evidentiary record in this case, the Government relies entirely on statements from the Plea Agreement and the Court's plea colloquy to argue that Yamaguchi fails to satisfy *Strickland*'s first prong. *See* ECF 69. Such arguments are not persuasive. *See Rodriguez-Vega*, 797 F.3d at 787. Rather, the Court considers only the advice that Elliott, Yamaguchi's *counsel*, gave her regarding the immigration consequences. *Id.*; *see also Hill*, 474 U.S. at 62 (White, J. concurring in the judgment) ("It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation and the failure to do so

clearly satisfies the first prong of the *Strickland* analysis."); *accord United States v. Urias-Marrufo*, 744 F.3d 361, 369 (5th Cir. 2014) ("It is counsel's duty, not the court's, to warn of certain immigration consequences, and counsel's failure cannot be saved by a plea colloquy.")

To determine whether Yamaguchi has shown that Elliott's performance was deficient, the Court considers only the advice that Elliott gave to Yamaguchi before she pled guilty to an aggravated felony with "virtually certain" deportation consequences. The three witnesses at the evidentiary hearing offer starkly different accounts of the relevant events. The Court discusses the testimony of Yamaguchi, Lindstrom, and Elliott below. Where relevant, the Court also considers other evidence in the record that either corroborates or undermines their testimony.

**i. Yamaguchi's Testimony**

Yamaguchi fluctuates between implying that Elliott told her nothing about immigration consequences or deportation at all, to conceding that Elliott never mentioned "definite deportation." Evidentiary Hearing Transcript 54:17-20. In her § 2255 motion, Yamaguchi contends that Elliott "did not inform her at all that the plea would definitely expose her to deportation after completion of her term in prison." ECF 58 at 6. Similarly, Yamaguchi states that she was never warned "that there would be mandatory consequences as a result of [her] plea." *Id.*

In her reply briefing when she was still proceeding *pro se*, Yamaguchi's testimony shifted to include allegations that Elliott never mentioned deportation to her at all, let alone its mandatory nature. She asserts that at first, Elliott did not even realize that she was not a citizen of the United States. *See* ECF 72 at 2. Then, when she informed Elliott that she was a Japanese citizen, "he acted as if that was not a problem." *Id.* Yamaguchi makes various allegations in her reply briefing, including that Elliott told another attorney that Yamaguchi "has no problem what-so-ever [sic] with immigration" and that "[Yamaguchi] will stay in the United States." *Id.* Moreover, she contends that Elliott never advised her of even the "*possibility* of deportation." *Id.* (emphasis added). Nevertheless, Yamaguchi "followed [Elliott's] advice blindly" and signed the Plea Agreement. *Id.*

Although Yamaguchi's reply does not appear to be signed under penalty of perjury, she also submitted a sworn affidavit in support of her § 2255 motion. *See* ECF 92 ("Yamaguchi

Affidavit"). In the affidavit, Yamaguchi does not make the above assertions that Elliott never mentioned deportation or removal to her at all. Rather, she states that "Elliott did not advise me that I faced the *certainty* of deportation upon entering the plea." *Id.* ¶ 5 (emphasis added). She adds that "I had no reason to believe that I faced deportation because of the conviction by guilty plea." *Id.* ¶ 6.

At the evidentiary hearing, Yamaguchi testified that she heard about the "deportation issue" for the first time when she went to prison after she pled guilty to the charges and was sentenced. *See* Evidentiary Hearing Transcript 54:21-24; 60:23-25. In other words, her testimony seemed to be that Elliott never advised her of even the possibility of deportation. When confronted on cross-examination with her own affidavit that stated Elliott did not advise her of the "certainty of deportation" rather than just "deportation," Yamaguchi stated only that "somebody helped me to write [the affidavit]." *Id.* 59:16. She could not explain why the affidavit used the word "certainty," and instead testified that "the words that is used here is not coming from me, right? I hope you understand because I didn't write it." *Id.* 61:10-11. On re-direct, Yamaguchi clarified that she heard the Court's reading at the plea colloquy that a conviction could possibly result in deportation. *Id.* 64:4-9. She then confirmed that she never had a discussion with Elliott regarding "what the possibility was" and Elliott never expressed a concern that she "would just absolutely" be deported if convicted. *Id.* 64:10-17.

**ii. Lindstrom's Testimony**

Yamaguchi's account is partially corroborated by the testimony of Carl Lindstrom, the attorney who represented her during the civil restitution proceedings around the same time as her criminal proceedings. Lindstrom submitted a declaration and also testified at the evidentiary hearing, explaining that he contacted Elliott on September 11, 2016 by telephone to discuss Yamaguchi's case. *Id.* 41:15-24. In that conversation, Elliott allegedly told Lindstrom that Elliott was not aware of or concerned with any immigration consequences of Yamaguchi's plea because she had lived in the United States for a long time and had property and family here. *Id.* 42:1-7 ("So [Elliott] didn't believe that there was going to be any immigration consequences. That's what I recall.")

Lindstrom testified that on the same day as their phone conversation, he followed up with Elliott by e-mail, writing to Elliott to ask: "One final question. Did you ever discuss with Ms. Yamaguchi the potential immigration consequences of pleading guilty to the charge?" *Id*. 43:1-4; *see also* ECF 93 ("Exhibit 1") at 2. Lindstrom explained that he asked the same question to Elliott in writing after their phone conversation because he "wanted to be clear what [Elliott's] position was on [the immigration consequences]." Evidentiary Hearing Transcript 43:13-14. Elliott responded to Lindstrom's e-mail as follows: "As we discussed, [Yamaguchi] is aware of her status. She also indicated more than once that if worst came to worst (i.e., deportation or removal proceedings), she would be happy moving back to Japan etc. We discussed the issue several times, along with the impact it could have on her and her family. Based on the evidence as we understood it, she was aware but not overly concerned with the potential immigration consequences." *Id*. 43:17-22; Exhibit 1 at 2.

Lindstrom followed up on Elliott's response, asking Elliott again: "What were the immigration consequences that you discussed with Ms. Yamaguchi prior to her entering the plea which she considered in making the plea?" Evidentiary Hearing Transcript 44:10-16; Exhibit 1 at 1. Elliott did not respond. Lindstrom testified that his e-mail exchange with Elliott "was not an accurate recitation of what our [phone] conversation was. And so I sent him an e-mail back specifically to clarify what he meant about [the immigration consequences]." Evidentiary Hearing Transcript 46:21-47:2. Elliott denies Lindstrom's account of their phone call, and testified that he never said that Yamaguchi did not face any immigration consequences as a result of her conviction. *Id*. 28:6-7.

Yamaguchi and Lindstrom's accounts contain various allegations that call into question whether Elliott understood the immigration consequences of Yamaguchi's plea, and thus whether he was able to advise her of the "virtual certainty" of her deportation. However, the inconsistencies in Yamaguchi's own testimony, as well as her obvious interest in the outcome of these proceedings, create concerns for the Court. Yamaguchi's assertion that Elliott never mentioned immigration consequences or deportation *at all* to her is not credible. As for Lindstrom, his prior discipline by the state bar diminishes his credibility. *See* Evidentiary Hearing

Transcript 50:8-12. The Court therefore focuses solely on Elliott's testimony.

**iii. Elliott's Testimony**

In evaluating Elliott's account, the Court considers the totality of his advice in order to determine whether it was equivalent to advising Yamaguchi that deportation or removal following her conviction was "virtually certain." At oral argument, counsel for Yamaguchi and the Government agreed that the Court need not make a credibility determination regarding Elliott's statements. Instead, Yamaguchi argued that even if everything Elliott says that he told Yamaguchi is true, "it's still inadequate." Evidentiary Hearing Transcript 73:4-16. The Court agrees and thus its inquiry focuses on whether Elliott's written statements and testimony at the evidentiary hearing, accepted as true, amount to effective assistance under the circumstances.

At the outset, the Court acknowledges that Elliott stated in his declaration and consistently testified at the hearing that he discussed the immigration consequences of Yamaguchi's plea with her "several times." *Id*. 12:9-10. Moreover, Elliott testified that he told Yamaguchi that if she pled guilty: "you must assume you will be deported, period." *Id*. 12:11-12; Elliott Decl. ¶ 4 ("In fact, I told Ms. Yamaguchi, on more than one occasion, that if she pled guilty she should 'assume that she would be deported.'"). Elliott further recalls discussing with Yamaguchi the "high likelihood" that she was going to be deported. *See* Evidentiary Hearing Transcript 22:13-16.

The Government urges the Court to stop its inquiry there. *See* Evidentiary Hearing Transcript 76:5-7 ("And the question is, under *Rodriguez-Vega*, is that virtually certain? Is 'you must assume you will be deported' equivalent to virtually certain?") Viewed in isolation, these statements could support a finding that Elliott advised Yamaguchi that her deportation or removal was "virtually certain." However, Elliott's comments are undermined by his own testimony and other evidence in the record. For example, Elliott recounted in his own declaration that he told Yamaguchi only that "she *might* be deported and/or denied naturalization following her conviction and sentence." Elliott Decl. ¶ 4 (emphasis added). The Court considers Elliott's testimony in light of the totality of the evidence regarding what he understood the immigration consequences to be and how he communicated that understanding to Yamaguchi prior to the entry of her plea.

There is quite a bit of evidence in the record that Elliott did not believe Yamaguchi's deportation was virtually certain. Elliott acknowledged that he harbored a "hope that [Yamaguchi] was not deported somehow." Evidentiary Hearing Transcript 15:23-24. On October 9, 2017, Elliott allegedly told Thompson that he believed that Yamaguchi had "a better chance than most" to avoid removal given her strong ties to the United States. *See* Thompson Decl. ¶ 6. According to Thompson, Elliott stated he thought Yamaguchi had a chance to avoid deportation because she had a Green Card and her children were U.S. citizens. Elliott told Thompson that "we were hoping that [deportation] wouldn't happen." *Id.* These statements imply that Elliott and Yamaguchi shared a belief that her deportation was not a foregone conclusion. When confronted on cross-examination with these statements, Elliott clarified that his expressed beliefs were inconsistent with how he advised Yamaguchi: "I advised her that she had to assume that she was going to be deported, and these other factors may not help." *Id.* 18:2-7.

Yet there is evidence in the record that Elliott's advice to Yamaguchi was more equivocal than he lets on. In his e-mail to Lindstrom on September 11, 2016, the authenticity of which Elliott verified on the witness stand, Elliott stated that Yamaguchi told him that she would be happy moving back to Japan "if worst came to worst (i.e. Deportation or removal proceedings)." Exhibit 1 at 2. This statement indicates that Elliott advised Yamaguchi that deportation was more of a "worst case" scenario, or tantamount to a "possibility" of deportation. In the same e-mail, Elliott told Lindstrom that Yamaguchi was "aware but not overly concerned with the *potential* immigration consequences." *Id.* (emphasis added).

In contrast to his statements in September 2016, Elliott sent an e-mail to the Government on October 10, 2017 in which he stated that Yamaguchi understood that deportation was "a very likely consequence" of taking the plea. *See* ECF 88 at 3. However, Elliott again undermines his statements by equating the advice that he gave to Yamaguchi with the language in the Plea Agreement and the Court's plea colloquy. As Elliott explains in his e-mail to the Government: "The Immigration consequences [] including deportation were also, spelled out within said Plea agreement. She read this document and signed it." *Id.* Although statements by the Government and the Court alone are not evidence of ineffective assistance under the first prong of *Strickland*,

their content is relevant to the extent that Elliott contends that his advice mirrored the statements in the Plea Agreement and plea colloquy.

Elliott was given a copy of the Plea Agreement at the evidentiary hearing, and he testified that his advisement to Yamaguchi was made in "similar language" to the Plea Agreement's discussion of immigration consequences. *See* Evidentiary Hearing Transcript 37:16-38:6. The Plea Agreement's language concerned only the potential for immigration consequences: "I acknowledge that pleading guilty *may* have consequences with respect to my immigration status if I am not a citizen of the United States." Plea Agreement ¶ 1. With respect to the Court's statements in the plea colloquy, Elliott testified that "when you look at the plea advice by the Court, it's very straightforward, and that's typically how I try and advise clients." Evidentiary Hearing Transcript 19:9-11. At the Change of Plea hearing, the Court advised Yamaguchi only that deportation was a possibility: "if you're not a citizen of the United States, in addition to any other possible penalties that you're facing, a plea of guilty *may* subject you to deportation, exclusion from admission into the United States, or voluntary departure and prevent you from obtaining U.S. Citizenship[.]" Plea Hearing Transcript 15:13-16:1 (emphasis added). The Court added: "I don't know that there's a possible deportation here. I don't know that." *Id*.

Thus, if the Court credits Elliott's testimony that his own advisements to Yamaguchi reflected the language in the Plea Agreement or the plea colloquy, his advice did not inform Yamaguchi that her deportation or removal was "virtually certain." *See Rodriguez-Vega*, 797 F.3d at 788 ("According to counsel's own declaration, before [the defendant] pled guilty he never informed her that she faced anything more than the mere 'potential' of removal.")

Finally, there is ample evidence in the record that Elliott did not understand that a § 1341 conviction resulting in a loss of over $10,000 constituted an aggravated felony. Without an understanding that the crime made her eligible for automatic deportation, Yamaguchi argues that Elliott could not adequately advise her of that certainty. *See* Evidentiary Hearing Transcript 67:20-25. The Court recognizes that a lawyer can have an imperfect understanding of the law and still properly advise his client. However, Elliott's failure to grasp the implications of Yamaguchi's conviction on her immigration status is troubling. Elliott apparently understood that Yamaguchi's

conviction was a "serious felony" and constituted "a crime of moral turpitude," but his testimony reveals that he was unaware that Yamaguchi's plea amounted to an aggravated felony under the immigration laws. *See, e.g.*, Evidentiary Hearing Transcript 10:11-16; 12:13-13:4; 38:7-39:16. In addition to Elliott's lack of understanding, Elliott could not recall advising Yamaguchi that her conviction constituted an aggravated felony:

> The Court: And was it your understanding that [Yamaguchi's conviction] was denominated a crime of moral turpitude?
>
> Mr. Elliott: I believe so.
>
> The Court: You were not – so you were not aware that [Yamaguchi's conviction] had been interpreted as being an aggravated felony?
>
> Mr. Elliott: I believe that I was, but I can't recall explaining or advising her of that.
>
> The Court: But are you – at the time were you personally aware that this was – had been deemed to be – this crime, 1341, had been deemed to be an aggravated felony and not a crime of moral turpitude?
>
> Mr. Elliott: I can't recall that if I was aware of that. I am not sure.
>
> The Court: And are you aware of the difference under the immigration laws?
>
> Mr. Elliott: I'm not aware specifically, no.

*Id*. 39:4-19.

There is also no indication that Elliott understood the significance of stipulating to a loss amount over $10,000, which made the § 1341 conviction an aggravated felony. Elliott explained only that Yamaguchi's case involved an amount that was "quite large." *See* Evidentiary Hearing Transcript 10:11-16. Elliott does not recall advising Yamaguchi of the effect of pleading guilty to a loss amount in excess of $10,000, which made her conviction an aggravated felony and rendered her automatically deportable. *Id*. 38:17-39:3.

Elliott's failure to know all of the intricacies of immigration law is not dispositive. The first prong of *Strickland* does not require criminal defense counsel to become experts on immigration law. The Supreme Court recognizes that "[i]mmigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal

charges, in either state or federal court of both, may not be well versed in it." *Padilla*, 559 U.S. at 369. This provides defense counsel with leeway to advise their clients that "pending criminal charges may carry a risk of adverse immigration consequences," if the law is *not* succinct and straightforward. *Id*. However, the Supreme Court emphasized in *Padilla* that "when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear." *Id*. Here, the Court finds, and the Government concedes, that Yamaguchi's plea of guilty to an aggravated felony rendered a non-citizen permanent resident in her position automatically deportable. Thus, "constitutionally competent counsel" would have advised her that her conviction made her subject to automatic deportation. *Id*. at 360.

The Court recognizes that the evidentiary record presents a close call on whether Elliott's performance was constitutionally ineffective. On one hand, Elliott testified that he told Yamaguchi to "assume that she would be deported" and that there was a "high likelihood" of deportation. However, he also told Yamaguchi that she "might" be deported, and equated his advice to the statements by the Government and the Court advising Yamaguchi that she "may" be deported. Elliott also told Lindstrom in a September 2016 e-mail that Yamaguchi was not "overly concerned with potential immigration consequences." In addition, Elliott clearly did not understand that Yamaguchi's conviction constituted an aggravated felony under the immigration laws and made her automatically deportable.

Even crediting as true that Elliott advised Yamaguchi that she "should assume she would be deported" at some point in his pre-plea advice, the fact that Elliott alternately advised her that she "might" be deported, or that deportation was the worst case scenario, causes the Court to conclude that Elliott's conduct fell below the range of competence demanded of attorneys in criminal cases. Such equivocation by counsel regarding immigration consequences is not sufficient where the law clearly required counsel to advise Yamaguchi that deportation was virtually certain as a result of pleading guilty to an aggravated felony. *Rodriguez-Vega*, 797 F.3d at 786. For these reasons, the Court finds that Elliott's advice was constitutionally ineffective.

**2. Resulting Prejudice**

Although the Court finds that Elliott's advice was objectively unreasonable, Yamaguchi's conviction and sentence can only be vacated under *Strickland* if she also demonstrates that she suffered prejudice as a result of Elliott's errors. 466 U.S. at 694; *see also Hill v. Lockhart*, 474 U.S. 52, 58 (1985) (applying the two-part test set forth in *Strickland* "to challenges to guilty pleas based on ineffective assistance of counsel"). To satisfy the prejudice prong, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is a standard of proof that is "sufficient to undermine confidence in the outcome" and is "somewhat lower" than a preponderance of the evidence. *Strickland*, 466 U.S. at 694; *Rodriguez-Vega*, 797 F.3d at 788. "[T]o obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla,* 559 U.S. at 372, 130 S.Ct. 1473. Where ineffective assistance leads a petitioner to accept a plea bargain, a different result means that "but for counsel's errors, [Yamaguchi] would either have gone to trial or received a better plea bargain." *United States v. Howard*, 381 F.3d 873, 882 (9th Cir. 2004); *accord Rodriguez-Vega*, 797 F.3d at 788.

In *Lee*, the Supreme Court rejected the government's argument that it would be irrational for a noncitizen to reject a plea offer and risk additional prison time in exchange for "holding on to some chance of avoiding deportation." 137 S.Ct. at 1969. Thus, in certain circumstances, it may be reasonable for someone in Yamaguchi's position to risk going to trial even in the face of overwhelming evidence of guilt, rather than plead guilty to an offense that makes deportation a virtual certainty. However, the Supreme Court emphasized that "surmounting *Strickland*'s high bar is never an easy task," and made clear that a defendant must offer "substantial and uncontroverted evidence" of prejudice. 137 S.Ct. at 1967, 1969.

Foreshadowing the exact circumstances presented here, the Supreme Court warned lower courts that they must not "upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Id*. at 1966-67.

Other than Yamaguchi's own post hoc assertion that she would not have entered her guilty plea but for Elliott's deficient advice, there is a complete absence of evidence of prejudice in the record. It is on this basis that Yamaguchi's § 2255 motion must be DENIED.

Yamaguchi states in her motion to vacate that "had [she] been warned by counsel of the certainty of immigration consequences of the plea she would not have entered a plea in the instant case and instead would have chosen to proceed to trial." § 2255 motion at 5. Yamaguchi's affidavit further states: "Had I known that I would be deported as a result of my plea of guilty, I would never have entered the guilty plea to the charge, instead, I would have either sought a different type of plea (which would not result in my necessarily being deported) or, alternatively, I would have gone to trial." Yamaguchi Affidavit ¶ 7. As discussed above, there are credibility issues with the affidavit because Yamaguchi conceded at the evidentiary hearing that she did not write it, and appeared confused by its contents. However, Yamaguchi testified that had she been advised that she would be subject to mandatory deportation by entering her plea, she would not have entered the plea. Evidentiary Hearing Transcript 53:2-5. The Court accepts Yamaguchi's statements, but must be careful to avoid crediting her "post-hoc assertions" of how she would have pled without contemporaneous evidence to substantiate her preferences. *Lee*, 137 S.Ct. at 1967.

Yamaguchi argues that her statements to the Probation Office, documented in her Probation Presentence Report, demonstrate prejudice. *See* ECF 18. As counsel for Yamaguchi repeated at the evidentiary hearing, the probation officer asked Yamaguchi about her plans for the future around the time of her sentencing. She responded: "Being together with the family while looking for a job. I want to continue to take care of the family with our current medical problems and seeking gainful employment to pay for restitution and living expenses." Evidentiary Hearing Transcript 14:20-15:4. Yamaguchi argues that this evidence makes clear that she *expected* to stay in the United States and was unaware of the virtual certainty of her deportation or removal. This evidence lends some support to Yamaguchi's contention under the first prong of *Strickland* that she was never informed that her deportation would be virtually certain if she pled guilty to an aggravated felony. However, it does not corroborate her statement that she would have rejected the plea had she known of such consequences.

This Court recognizes the difficulties associated with proving a negative. How can Yamaguchi, who has successfully shown that she was *not* informed of the virtual certainty of her deportation, point to contemporaneous evidence from the time of her plea negotiations that she would have pled differently had she been so informed? An examination of the evidence offered by the defendants in *Lee* and *Rodriguez-Vega* reveals the type of evidence that would suffice, and makes clear that such evidence is entirely lacking from the evidentiary record in this case.

The Court disagrees with Yamaguchi that *Lee* involves a defendant in Yamaguchi's exact circumstances. *See* Evidentiary Hearing Transcript 75:1-3. The defendant in *Lee* was also a lawful permanent resident of the United States who moved to vacate his conviction under § 2255 on the grounds of ineffective assistance of counsel, but the similarities end there. The Supreme Court held that Lee had satisfied his burden of proof on prejudice by adequately demonstrating a reasonable probability that he would have rejected a plea for a drug offense "had he known that it would lead to mandatory deportation." 137 S.Ct. at 1967. Unlike the circumstances in Yamaguchi's case, Lee presented ample evidence that deportation was the "determinative issue" in his plea decision. *Id.*

In holding that Lee had shown prejudice under *Strickland*, the Supreme Court pointed to contemporaneous evidence that Lee had repeatedly asked his attorney during plea negotiations whether he faced a risk of deportation. In addition, both Lee and his plea-stage counsel testified at an evidentiary hearing that Lee would have gone to trial but for his counsel's failure to apprise him of the immigration consequences of his plea. *Id.* at 1967-68. There was also evidence in the record that during Lee's plea colloquy, he was visibly confused by the judge's comments about the immigration consequences of pleading guilty. *Id.* At the plea colloquy, Lee did not enter his plea until he was reassured by his counsel that the judge's admonition was a "standard warning." *Id.* at 1968.

In light of this evidence, the Supreme Court found that but for his counsel's incompetence, "Lee would have known that accepting the plea agreement would *certainly* lead to deportation. Going to trial? *Almost* certainly." *Id.* The Court held that the difference between "almost" and "certainly" made a difference in the "unusual circumstances" of Lee's case. *Id*. 1967. This is

because the "substantial and uncontroverted evidence" demonstrated a reasonable probability that Lee would not have accepted a plea had he been properly informed that he would be deported, despite the grim prospects he faced at trial. *Id.* at 1969.

Similarly, the Ninth Circuit held that the defendant in *Rodriguez-Vega* demonstrated a reasonable probability that she would have purposefully avoided adverse immigration consequences had she known of the virtual certainty of her removal. 797 F.3d at 789. There was contemporaneous evidence that Rodriguez-Vega placed particular emphasis on preserving her ability to remain in the United States. *Id.* at 790. For example, Rodriguez-Vega had rejected an initial plea bargain that contained a stipulated removal provision, and only accepted the revised plea after the stipulation was removed. *Id.* at 789. Counsel for Rodriguez-Vega also admitted that he advised her that she might improve her chances of staying in the U.S. if she pled guilty to a misdemeanor rather than a felony. Such advice supported Rodriguez-Vega's assertion that she pled guilty to a misdemeanor in order to limit her chances of removal. *Id.*

To the extent that Yamaguchi asserts that she would have rejected the plea in this case and insisted on a "different type of plea," she offers no corroborating evidence. A petitioner making such a claim may show a reasonable probability that she would have negotiated a better plea deal "by identifying cases indicating a willingness by the government to permit defendants charged with the same or a substantially similar crime to plead guilty to a non-removable offense." *Id.* at 788. While it is conceivable that a defendant in Yamaguchi's position might have tried to negotiate a mail fraud conviction with a stipulated amount of less than $10,000 to avoid the immigration consequences of an aggravated felony, there is absolutely no evidence or case law indicating that the Government would have made such an offer. Such an outcome is particularly unlikely in light of the Government's ability to prove beyond a reasonable doubt that Yamaguchi defrauded her employer out of over $300,000. There is simply no indication in the record that Yamaguchi could have negotiated a better plea.

Yamaguchi also fails to demonstrate a reasonable probability that she would have rejected the plea and gone to trial. Unlike the defendants in *Lee* and *Rodriguez-Vega*, there is no evidence in the record that immigration was a "determinative issue" in Yamaguchi's plea discussions.

Yamaguchi did not raise any immigration concerns with Elliott other than initially informing him that she was not a U.S. citizen. There is absolutely no indication that she placed a "great emphasis" on remaining in the United States, or that her immigration status was the overriding consideration in her decision to accept the plea agreement. *Rodriguez-Vega*, 797 F.3d at 790. The Court recognizes that Yamaguchi has two adult children and a husband who are United States citizens, and she has been living and working in the United States for decades. Despite these obviously important ties to the country, there is no evidence that Yamaguchi pled guilty due to any immigration-related concerns. Moreover, Elliott's testimony does not corroborate any allegation that Yamaguchi prioritized staying in the United States. There is not even a shred of "contemporaneous" or "substantial and uncontroverted evidence" to support Yamaguchi's unadorned statements that she would have reasonably risked going to trial to avoid deportation or removal. *Lee*, 137 S.Ct. at 1969.

In fact, there is evidence that Yamaguchi pled guilty for reasons that are entirely unrelated to Elliott's deficient performance in advising her of immigration consequences. The record indicates that Yamaguchi accepted responsibility and pled guilty to the charges early on in order to end the Government's investigation and protect others who may have been involved in the scheme. In an e-mail sent by Elliott to Carl Lindstrom on September 11, 2016, Elliott explained that Yamaguchi's own family members were "alleged to be involved and subject to indictment." ECF 93 at 5. Regarding Yamaguchi's motivations in taking the plea, Elliott stated: "Ms. Yamaguchi chose to defer further discovery and accepted responsibility at an early stage of the proceedings. This to avoid protracted litigation and the expected (and promised) indictment of other individuals." *Id*. Importantly, Elliott explained that Yamaguchi "did not want her son and others indicted…This would have been the US attorneys [sic] very next step." *Id*. at 3.

Elliott testified that Yamaguchi was more concerned with protecting others—including her family members—from indictment, than she was with the plea's immigration consequences. *See* Evidentiary Hearing Transcript 36:8-37:2. In fact, Elliott was surprised by how little Yamaguchi was concerned about the potential immigration consequences of the plea. *Id*. 37:3-5. Yamaguchi confirmed that Elliott warned her that if she did not take the plea, "other people will get involved

and so on and so forth." *Id*. 58:3-5. Yamaguchi testified that because she was the "leader," meaning the president of YSA, she decided to plead guilty. *Id*. 58:6-12. The following exchange on cross-examination makes clear that Yamaguchi's desire to end the investigation and avoid the indictment of others was the driving force in her decision to plead guilty to the charges:

> The Government: Did you plead guilty in this case because you thought that that would end the investigation, that the charges would be wrapped up?
>
> Yamaguchi: Yes.
>
> The Government: You would be the only person who was charged?
>
> Yamaguchi: Correct, sir.

*Id*. 63:16-21.

The Court concludes that Yamaguchi's after-the-fact statement about how she would have pled is the only evidence of prejudice in the record. Yamaguchi's case is therefore distinguishable from the circumstances in *Lee* and *Rodriguez-Vega* that led the Supreme Court and the Ninth Circuit to vacate the defendants' convictions. As discussed above, the Supreme Court expressly warned lower courts against upsetting a plea based solely on the defendant's "post hoc" assertions. 137 S.Ct. at 1967. Without "contemporaneous evidence to substantiate a defendant's expressed preferences," the Court cannot say that Yamaguchi would have pled differently or gone to trial had Elliott advised her that her mail fraud conviction subjected her to virtually certain deportation. *Id*.

Granting Yamaguchi's § 2255 motion on the evidentiary record presented here would effectively eliminate the second prong of *Strickland*. To find prejudice based on nothing more than Yamaguchi's uncorroborated statement would defy the Supreme Court's instructions in *Lee* and open the floodgates to defendants looking to overturn their convictions regardless of the impact of counsels' errors on their decision-making. Especially here, where there is evidence that Yamaguchi accepted responsibility and pled guilty to an aggravated felony for reasons unrelated to immigration consequences, she has not demonstrated a reasonable probability that she would have rejected the plea had she known that she would be subject to mandatory deportation.

This result is consistent with the decisions of other federal courts in the immediate aftermath of *Lee*. For example, the Eleventh Circuit in *Dodd v. United States* affirmed the district

court's denial of the defendant's § 2255 motion for failure to demonstrate prejudice because "the record does not show any contemporaneous evidence that Dodd was concerned about deportation at the plea hearing or sentencing." No. 16-11598, 2017 WL 4231073, at *2 (11th Cir. Sept. 25, 2017). As in Yamaguchi's case, there was evidence in *Dodd* that the defendant pled guilty for reasons that were unrelated to the immigration consequences of the plea. *Id*. (crediting testimony that "Dodd pled guilty because of the possibility of facing her daughter at trial, and because of the evidence presented at her son's trial.")

This Court's decision is thus in line with those courts following *Lee*'s instruction to undergo a "case-by-case examination of the totality of the evidence," and denying post-conviction relief in the absence of substantial and uncontroverted evidence of prejudice. 137 S.Ct. at 1966; *see, e.g.*, *United States v. Pola*, No. 16-6295, 2017 WL 3098179, at *6 (6th Cir. July 21, 2017) (affirming judgment on direct appeal of conviction, holding that "in contrast with the substantial *evidence* presented in *Lee*, we have *only* Pola's *post hoc* assertions.") (emphasis in original); *Young v. Spinner*, 873 F.3d 282, 288 (5th Cir. 2017) (affirming denial of habeas relief, finding that "[a]s opposed to Lee, who could point to substantial contemporaneous evidence that he would have risked a trial absent his attorney's error, Young relies largely on hindsight."); *United States v. Garcia*, No. CR 99-0699-RSWL-3, 2017 WL 3669542, at *6 (C.D. Cal. Aug. 24, 2017) (denying writ of coram nobis because "[u]nlike *Rodriguez–Vega* and *Lee*, the facts here do not as clearly show that Defendant opted for his plea exclusively because of his immigration-related concerns."); *but see Tzen v. United States*, No. 16-0734-DRH, 2017 WL 4233077, at *3 (S.D. Ill. Sept. 22, 2017) (vacating conviction pursuant to § 2255 in light of contemporaneous evidence that avoiding deportation was the focus of Tzen's decision-making; including evidence that her counsel e-mailed the government before she pled guilty stating that "Tzen is desperate not to be deported.")

For the foregoing reasons, the Court finds that Yamaguchi has not satisfied the second prong of her ineffective assistance of counsel claim under *Strickland*, and her motion to vacate her conviction and sentence pursuant to § 2255 is DENIED.

## IV. CERTIFICATE OF APPEALABILITY

Absent a certificate of appealability ("COA") from the circuit court or the district court, "an appeal may not be taken from a final decision of a district judge in a habeas corpus proceeding or a proceeding under 28 U.S.C. § 2255." *See Chafin v. Chafin,* 133 S.Ct. 1017, 1030 (2013). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. *See id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

No certificate of appealability shall issue, as the Court finds that Yamaguchi has not made a "substantial showing of the denial of a constitutional right." § 2253(c)(2). Reasonable jurists would not find debatable whether Yamaguchi demonstrated a reasonable probability that she would have rejected the plea but for Elliott's errors. Thus, the Court declines to issue a certificate of appealability. *See* Rule 11(a) Governing Section 2255 Proceedings. Yamaguchi may not appeal the denial of a certificate of appealability in this Court, but she may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.

## V. ORDER

For the foregoing reasons, Yamaguchi's § 2255 motion is DENIED. No certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(1)(B). The Clerk of the Court is directed to enter judgment for the Government and against Yamaguchi and close the file in the related civil action 5:17-cv-00786 BLF.

Dated: November 7, 2017

BETH LABSON FREEMAN
United States District Judge